# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LORI NEWHOUSE,

        Defendant.

No. CR11-3030-MWB

**SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c)**

---

## TABLE OF CONTENTS

**I.   INTRODUCTION AND BACKGROUND**................................................. 6
    **A.   Indictment, Guilty Plea, And Sentencing Hearing**........................... 6
    **B.   Arguments Of The Parties** ..................................................... 8
        **1.   Amicus curiae's arguments**.............................................. 8
        **2.   Newhouse's arguments**.................................................. 8
        **3.   The prosecution's arguments** ......................................... 8

**II.   LEGAL ANALYSIS** ................................................................. 9
    **A.   Sentencing Methodology:   Computing The Guideline Range, Departures, And Variances**...................................................... 9
    **B.   Step 1-Determination Of The Guideline Range**........................... 12
    **C.   Step 2-Determination Of Whether To Depart** ............................ 16
    **D.   Troublesome Aspects Of The Career Offender Guideline— Potential For A Policy Disagreement** ...................................... 17
        **1.   Background on policy disagreement based variances** ............. 17
        **2.   Flaws in the Career Offender Guideline**........................... 23
            **a.   A flawed creation** .............................................. 23
                **i.   The Sentencing Commission's institutional role** ....................................................... 23
                **ii.   Flawed origins and expansions of the Career Offender guideline**...................................... 25
            **b.   Failing to promote the goals of sentencing**................. 35

|  |  | i. | *Just punishment in light of the seriousness of the offense* .................................................. 35 |
|  |  | ii. | *Protecting the public against further crimes of the defendant* ............................................. 36 |
|  |  | iii. | *Deterrence*................................................. 38 |
|  |  | iv. | *Rehabilitation in the most effective manner* ........ 39 |
|  |  | v. | *Unwarranted sentencing disparities—unwarranted uniformity* ............................. 40 |
|  |  | vi. | *Unwarranted sentencing disparities—similarly situated defendants* ..................................... 44 |
|  |  | vii. | *Promoting respect for the law* .......................... 45 |
|  | E. | **Step 3- Application Of The § 3553(a) Factors** ............................ 47 |
|  |  | 1. | *Overview of § 3553(a)* .................................... 47 |
|  |  | 2. | *The nature and circumstances of the offense* ...................... 48 |
|  |  | 3. | *Newhouse's history and characteristics* ............................. 49 |
|  |  | 4. | *The need for the sentence imposed* ................................... 51 |
|  |  | 5. | *The kinds of sentences available* ..................................... 59 |
|  |  | 6. | *Any pertinent policy statement* ....................................... 59 |
|  |  | 7. | *The need to avoid unwarranted sentencing disparities* ............ 60 |
|  |  | 8. | *The need to provide restitution* ....................................... 63 |
|  |  | 9. | *Consideration of downward variance and sentence* ................ 63 |
|  |  |  | i. | *Quasi-categorical policy disagreement* ............... 64 |
|  |  |  | ii. | *Variance and sentence* ................................... 65 |
|  | F. | **The Prosecution's Substantial Assistance Motions** ......................... 66 |

**III.** **CONCLUSION** .......................................................................... 67

Does the **grid** and bear it scheme of the U.S. Sentencing Guideline Career Offender recidivist enhancement, § 4B1.1, raise a specter of aperiodic, irrational, and

arbitrary sentencing guideline ranges in some cases?[1] This issue is squarely raised by Lori Ann Newhouse, a low-level pill smurfer, "[a] person who busily goes from store to store acquiring pseudoephedrine pills for a meth cook, usually in exchange for finished product."[2] Not only is Newhouse a mere pill smurfer, she is truly a "one day" Career Offender because her two prior drug predicate offenses arose out of a single police raid of a Motel 6 room over a decade ago, on February 26, 2002, in Altoona, Iowa, when Newhouse was just 22 years old. The police found Newhouse and three others in the motel room. Newhouse was charged in state court and pled guilty to possession with intent to deliver 3.29 grams of methamphetamine and 14.72 grams of psilocybin mushrooms. She was sentenced to *probation* on both charges, but on different days, by Chief Judge Arthur Gamble of the Fifth Judicial District of Iowa. For reasons unknown, but likely random, the local prosecutor filed the two charges on separate days. Ironically, if the two charges had been filed in the same charging document **or** the defense lawyer, the prosecutor, the judge or the court administer had

---

[1] The current sentencing table (grid) contains 43 offense levels on a vertical axis and 6 criminal history categories on a horizontal axis that intersect to form a sentencing grid with 258 cells that each contain an advisory guideline sentencing range, except for the 6 cells for offense level 43 that have a single sentence: life. U.S. SENTENCING GUIDELINES MANUAL Ch. 5, Pt. A, Sentencing Table (2012).

[2] Rob Bovett, *Methamphetamine: Casting a Shadow Across Disciplines and Jurisdictions*, 82 N.D. L. REV. 1195, 1208 n.86 (2006). Pill smurfers' role in methamphetamine production was enhanced as a result of the Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, § 711, 120 Stat. 192, 256-63 (2006), which requires, inter alia, all products containing pseudoephedrine be placed behind a sales counter and retailers to maintain a logbook of pseudoephedrine purchases. In order to obtain sufficient quantities of pseudoephedrine, methamphetamine manufacturers have increasingly turned to pill smurfers to make multiple purchases of products containing pseudoephedrine from multiple stores—a process known in the methamphetamine trade as "smurfing."

scheduled the two sentencings for the same day—Newhouse would not be a Career Offender.

Because of Newhouse's Career Offender status, her U.S. Sentencing Guideline range was enhanced from 70-87 months to a staggering and mind-numbing 262 to 327 months. This breathes real life into the observation of the Seventh Circuit Court of Appeals, a year before Newhouse pled to the state court drug charges, that: "The consequences of being deemed a career offender for purposes of section 4B1.1 of the U.S. Sentencing Guidelines are grave." *United States v. Hoults*, 240 F.3d 647, 648 (7th Cir. 2001). Newhouse is just one of thousands of "low hanging fruit" — non-violent drug addicts captured by the War on Drugs and filling federal prisons far beyond their capacity.[3] *See United States v. Vasquez*, No. 09-CR-259 (JG), 2010 WL

---

[3] The Government Accounting Office (GAO), in September of 2012, submitted A Report to Congressional Requesters titled Bureau of Prisons—Growing Inmate Crowding Negatively Affects Inmates, Staff and Infrastructure. This report found that the Federal Bureau of Prisons (BOP) population "has increased 400 percent since the late 1980's, and by about 50 percent since 2000." U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-12-743, BUREAU OF PRISONS: GROWING INMATE CROWDING NEGATIVELY AFFECTS INMATES, STAFF AND INFRASTRUCTURE 1 (2012). The report also found that federal prisons now exceed system wide capacity by 39% and overcrowding is most severe, 55%, at the highest security level prisons. *Id.* at 55. The Report found that 48% of the BOP inmates were serving sentences for drugs and that the average drug sentence is now more than 250% longer than when the U.S. Sentencing Commission drafted the U.S. Sentencing guidelines in 1987 to implement the Sentencing Reform Act of 1984. *Id.* at 14, 48. "According to BOP, the increase in sentence length is the primary reason for the growth in the federal inmate population from 42,000 in 1987 to over 218,000 today. Drug offenses constitute the largest component of admissions to BOP." *Id.* at 48. In terms of the "low-hanging fruit" of the War on Drugs, former United States District Court Judge for the Southern District of New York, John S. Martin, wrote nearly a decade ago:

> Our current sentencing scheme leads to inefficiency in
> the war against drugs. We have gotten to the draconian

sentences which exist today because ever since I was an Assistant United States Attorney in the early 1960s, drug enforcement officials would tell Congress, "We can win the war on drugs if we increase drug sentences." Time after time Congress would respond to that argument by increasing the penalties. However, these harsh penalties are applied without any thought about the level of involvement of the particular defendant in the narcotics distribution scheme. When you fail to distinguish between major and minor violators, you give the law enforcement community the ability to brag about their success in prosecuting narcotics violators. They can testify before Congress and say, "Look, there are 30,000 people who are in federal prison for sentences of over ten years because of their narcotics violations." What is not said is that the incarceration of ninety-five percent of those individuals will have no meaningful impact on the amount of drugs distributed because those individuals are low level members of narcotics distribution organizations who can be immediately replaced upon arrest.

It is very easy for drug enforcement officers to go out on the street and arrest addicts selling drugs. But you end up with somebody doing more than twenty years in jail who was immediately replaced by another addict willing to sell drugs to get some for himself. Drug agents can create impressive statistics by arresting low level drug dealers. It takes a much greater law enforcement effort to prosecute major violators who do not operate openly on the streets. If we simply limited the harsh penalties to major violators, we would be providing the Drug Enforcement Agency with an incentive to concentrate their efforts on major violators and we would have a way of measuring the success of law enforcement in the war on drugs.

Let me conclude by summing up my views on mandatory minimum sentences. They are cruel, unfair, a waste of resources, and bad law enforcement policy. Other than that they are a great idea.

1257359, at *3 (E.D.N.Y. Mar. 30, 2010) (observing that in "the war on drugs" "prosecutors can decide that street-level defendants like Vasquez—the low-hanging fruit for law enforcement—must receive the harsh sentences that Congress intended for kingpins and managers, no matter how many other factors weigh in favor of less severe sentences."); *see also* Susan Stuart, *War As Metaphor And The Rule Of Law In Crisis: The Lessons We Should Have Learned From the War On Drugs*, 36 S. ILL. U. L.J. 1, 5 (2011) (pointing out that the war on drugs "has lasted longer than the reigns of the Roman Emperors Caligula through Nero."); Marc Mauer, *The Sentencing Project, The Changing Racial Dynamics of the War on Drugs* 1 (2009) (reporting that there has been an 1100% increase in the number of persons incarcerated on drug charges since 1980, from about 40,000 people to 500,000 in 2009).[4]

## I.  INTRODUCTION AND BACKGROUND

### A.  Indictment, Guilty Plea, And Sentencing Hearing

On July 28, 2011, an Indictment was returned against Newhouse, charging her with manufacturing or attempting to manufacture 5 grams or more of pure methamphetamine, or a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C).[5] On April 26, 2012, Newhouse pled guilty before a U.S. magistrate judge

---

John S. Martin, Jr., *Why Mandatory Minimums Make No Sense*, 18 NOTRE DAME J.L. ETHICS & PUB. POL'Y 311, 317 (2004).

[4] Available at http://sentencingproject.org/doc/dp_ raceanddrugs.pdf.

[5] Five co-defendants were also named in the Indictment:  Tracy Allen Young, Martin Roy Brobst, Sandra Kaye Young, Patrick Timothy McGuire, and Rex Allan Silvey.  All of the co-defendants, but not Newhouse, were also charged with conspiring to manufacture and distribute 50 grams or more of methamphetamine, or to

to Count 2 of the Indictment. On that same day, I accepted Newhouse's guilty plea. A probation officer then prepared a presentence report ("PSR"). The PSR found that Newhouse was a Career Offender because of her two prior predicate drug convictions. Before sentencing, Newhouse filed a Motion for Variance and her Sentencing Memorandum. On September 19, 2012, after reviewing Newhouse's Motion for Variance and her Sentencing Memorandum, I continued the sentencing because of the serious and complex issues raised, but not fully briefed, and requested the Federal Public Defender to enter the case as *amicus curie*. They did and the parties were given the opportunity to submit further briefing on the application of the Career Offender guideline to Newhouse. The Federal Public Defender filed an extensive and illuminating *amicus curie* brief, including a comprehensive discussion of reasons for disagreeing with the Career Offender guideline on policy grounds.[6] The prosecution filed a short brief offering no objection to a substantial downward variance based solely on the facts of Newhouse's prior predicate convictions. However, the prosecution urged me not to vary downward based on the 18 U.S.C. § 3553(a) factors and any policy disagreements with the Career Offender guideline.

At the sentencing hearing on January 29, 2013, the prosecution, Newhouse and the *amicus* all presented documentary evidence. The prosecution also made motions for downward departure based on substantial assistance under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. After extensive and lively oral arguments punctuated with many

---

manufacture 5 grams or more of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846.

[6] The sentencing brief by the Federal Public Defender, James F. Whalen, was superbly crafted and sets the gold standard for sentencing briefs by criminal defense lawyers.

questions by me, and Newhouse's allocution, I sentenced Newhouse. This opinion explains and amplifies the rationale for my sentence.

## B. Arguments Of The Parties

### 1. Amicus curiae's arguments

The *amicus* argues that I have the authority to vary from the Career Offender guideline based on policy disagreements with that guideline. The *amicus* next argues that I should do so for the following policy reasons. First, the *amicus* contends that the Career Offender guideline was not developed as a result of the Sentencing Commission's exercise of its characteristic institutional role. Second, the *amicus* contends that the Sentencing Commission has steadily expanded the scope of the Career Offender guideline beyond Congress's statutory directive, and that this expansion has been undertaken without reliance upon, and contrary to, empirical data and national experience. Finally, the *amicus* argues that the resulting guideline, as applied to low-level participants in drug offenses, yields sentences that are greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

### 2. Newhouse's arguments

Newhouse joined the *amicus's* arguments.

### 3. The prosecution's arguments

The prosecution asserts that Newhouse's unique criminal history warrants a significant downward variance. Specifically, the prosecution acknowledges that, because a single incident in 2002, resulted in Newhouse having two separately scored controlled substances offense convictions, a substantial downward variance is warranted. The prosecution recommends a downward variance from the bottom of Newhouse's advisory guideline range, 262 months, to at or about Newhouse's mandatory minimum sentence of 120 months. The prosecution, argues, in

breathtakingly conclusory and cursory briefing, that a downward variance is not warranted based on either Newhouse's "personal/offense characteristics", under 18 U.S.C. § 3553(a), or any policy disagreements with the Career Offender guideline. The prosecution's enlightened sentencing position, while welcomed for its bottom line, is analytically odd because in supporting their variance position they fail to mention or cite a single § 3553(a) factor.

## II.  LEGAL ANALYSIS

### A.  Sentencing Methodology: Computing The Guideline Range, Departures, And Variances

Following the Supreme Court's decision in *Gall*, the Eighth Circuit Court of Appeals has repeatedly stated the methodology for determining a defendant's sentence as follows:

> The district court should begin "by correctly calculating the applicable Guidelines range."  "[T]he Guidelines should be the starting point and the initial benchmark [,but] [t]he Guidelines are not the only consideration[.]"  The district judge should allow "both parties an opportunity to argue for whatever sentence they deem appropriate," and then should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."

*United States v. Hill*, 552 F.3d 686, 691 (8th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)) (internal citations omitted); *United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008); *see also United States v. Feemster*, 572 F.3d 455, 461-62 (8th Cir. 2009) (*en banc*).

The Supreme Court has recognized that a party's argument for a sentence outside the calculated guideline range may "take either of two forms." *Rita v. United States*, 551 U.S. 338, 344 (2007).  A party may "argue *within the Guidelines' framework*, for

a departure," *id.* (emphasis in original), or a party may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a [different] sentence." *Id*[7] The Eighth Circuit Court of Appeals has made clear that, while "similar factors may justify either a variance or a traditional departure," *United States v. Woods*, 670 F.3d 883, 888 (8th Cir. 2012), district courts are not limited by the guidelines' departure policy framework when determining whether and by what extent to vary, *see United States v. Chase*, 560 F.3d 828, 832 (8th Cir. 2009); *United States v. VandeBrake*, 679 F.3d 1030, 1037 (8th Cir. 2012); *see also United States v. Villareal-Amarillas*, 562 F.3d 892, 898 (8th Cir. 2009) ("The judge is cabined, but also liberated, by the § 3553(a) factors.").[8]

As a matter of procedure, the Eighth Circuit Court of Appeals has instructed that district courts should "continue to engage in the three-step process of first ascertaining the applicable Guidelines range, then considering any permissible departures within the Guidelines' structure, and finally, deciding whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to § 3553(a)." *See United States v. Washington*, 515 F.3d 861, 866 (8th Cir. 2008).

---

[7] As the Eighth Circuit Court of Appeals has explained:

"'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States*, 553 U.S. 708 (2008). A variance, on the other hand, is a "non-Guidelines sentence[ ] based on the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Solis-Bermudez*, 501 F.3d 882, 884 (8th Cir. 2007).

*United States v. Mireles*, 617 F.3d 1009, 1012 n.2 (8th Cir. 2010).

[8] *See Irizarry*, 553 U.S. at 714-15 ("[T]here is no longer a limit comparable to [a departure] on the variances from Guidelines ranges that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a).").

Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'" *United States v. Henson*, 550 F.3d 739, 740 (8th Cir. 2008) (quoting *Rita* 551 U.S. at 351). The Supreme Court has emphasized this point, noting "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (*per curiam*) (emphasis in the original).

As the Eighth Circuit Court of Appeals has also explained, "[w]e may not require "'extraordinary' circumstances to justify a sentence outside the Guidelines." *Feemster*, 572 F.3d at 462 (quoting *Gall*, 552 U.S. at 47). Instead, the district court

> must "make an individualized assessment based on the facts presented." [Gall, 552 U.S. at 50.] If the court concludes that a sentence outside of the Guidelines range is warranted, then it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. "[A] major departure should be supported by a more significant justification than a minor one." Id. After the district court determines the "appropriate sentence," it must then "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." Id.

*Feemster*, 572 F.3d at 461.

First, I will determine the advisory guideline range for Newhouse. Next, I will determine whether any traditional (non-substantial assistance) departures, either upward or downward, are warrented.. Third, I will consider whether to vary from the advisory guideline range based on my independent obligation to apply the § 3553(a) factors, including any policy disagreements with the Career Offender guideline. I may not rely

on the § 3553(a) sentencing factors to impose a sentence below the mandatory minimum required by statute, even when the prosecution has filed and I grant a substantial assistance motion under § 3553(e). *See United States v. Madison*, 585 F.3d 412, 413 (8th Cir. 2009). However, in cases like this one, where the guideline range exceeds the mandatory minimum, I may first consider the § 3553(a) factors to reduce a defendant's sentence. Depending on the strength of the § 3553(a) factors, this may include down to, but not below, the mandatory minimum. *See United States v. Coyle*, 506 F.3d 680, 683 (8th Cir. 2007). Then, if I grant the prosecution's § 3553(e) motion, I may go below the mandatory minimum but only by applying the U.S.S.G. factors contained in § 5K1.1. Finally, I will decide the prosecution's motions for downward departure based on Newhouse's substantial assistance.

### B.  Step 1-Determination Of The Guideline Range

In determining Newhouse's advisory guideline range, I used the November 1, 2012, edition of the United States Sentencing Commission Guidelines Manual. *See United States v. Lozoya*, 623 F.3d 624, 625 (8th Cir. 2010); *see also VandeBrake*, 679 F.3d at 1039 n.7. The guideline for a violation of 21 U.S.C. § 841(a)(1) is found in § 2D1.1 and the Drug Quantity Table in § 2D1.1(c)(6). The parties agree, and I find, those sections set a base offense level of 28 because the offense involved at least 20, but less than 35, grams of pure methamphetamine. The parties agree, and I find, that Newhouse's offense involved 20 grams of pure methamphetamine; thus, her base offense level is 28. I next examine the potential offense level adjustments and enhancements. The parties agree, and I find, that Newhouse was a minor participant in the offense and qualifies for a two point reduction, pursuant to U.S.S.G. § 3B1.2(b). The parties further agree, and I find, that Newhouse qualifies for a three point reduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a)-(b). If

Newhouse did not qualify as a Career Offender, her adjusted offense level would be 23. With a criminal history category IV and an offense level 23, her advisory guideline range is 70 to 87 months. She is subject to a mandatory minimum sentence of 60 months, pursuant to 18 U.S.C. § 841(b)(1)(B).[9] However, because the prosecution, in its sole discretion, filed an information under 21 U.S.C. § 851 based on a prior conviction for a "felony drug offense," her mandatory minimum doubles from 60 months to 120 months, and her statutory maximum increases from 40 years to life imprisonment. *See* 21 U.S.C. § 841(b)(1)(B); *id*. § 851(a)(1) (providing that a person convicted under § 841 may be subject to increased punishment by reason of one or

---

[9] Neither Newhouse nor the *amicus* have questioned application of the statutory five year mandatory minimum sentence for more than 5 grams of methamphetamine which then doubles for Newhouse because of the § 851 enhancement. Compared to methamphetamine, marijuana, once stripped from the plant, takes 20,000 times greater quantity (100,000 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, powder cocaine takes 100 times greater quantity (500 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, heroin takes twenty times greater quantity (100 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, crack, after the passage of the Fair Sentencing Act, now takes nearly six times greater quantity (28 grams) to trigger a five-year mandatory minimum. *See* 21 U.S.C. § 841. Are there any factual or rational bases to set the methamphetamine quantity to trigger a five-year mandatory minimum so low in comparison to these other drugs? In Yogi Berra's words, this could be "déjà vu all over again" with penalties for methamphetamine, as with crack, driven by hysteria surrounding perceived problems that turned out to be largely illusory. *See United States v. Williams*, 788 F. Supp. 2d 847, 859-61 (N.D. Iowa 2011) (observing that the crack/powder cocaine disparity in the sentencing guidelines was based on Congress's unfounded fears about crack's dangers). Indeed, the death of University of Maryland basketball star Len Bias, which spurred Congress to pass the Anti-Drug Abuse Act of 1986, making sentences for crack cocaine crimes 100 times harsher than those for powder cocaine, was mistakenly attributed to crack cocaine. Bias in fact died of an overdose of powder cocaine. *See* LaJuana Davis, *Rock, Powder, Sentencing—Making Disparate Impact Relevant In Crack Cocaine Sentencing*, 14 JOURNAL OF GENDER, RACE AND JUSTICE 375, 381-83 & n.32 (2011).

more prior convictions only if "the United States attorney files an information with the court"); *id*. § 802(44) (defining "felony drug offense" as "an offense that is punishable by imprisonment for more than one year under any law . . . that prohibits or restricts conduct relating to narcotic drugs").[10]

The Career Offender guideline, set out in U.S.S.G. § 4B1.1, provides in relevant part that:

> (a) A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.
>
> (b) . . . [I]f the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply. A career offender's criminal history category in every case under this subsection shall be Category VI.

| Offense Statutory Maximum | | Offense Level* |
|---|---|---|
| (1) | Life | 37 |
| (2) | 25 years or more | 34 |
| (3) | 20 years or more, but less than 25 years | 32 |
| (4) | 15 years or more, but less than 20 years | 29 |

---

[10] In fiscal year 2011, of the 4,546 methamphetamine defendants sentenced in federal court, 81.1%, or 3,685, received mandatory minimum sentences, and 57.8%, or 2,627, received a ten-year mandatory minimum sentence. U.S. Sentencing Comm'n, 2011 Sourcebook of Federal Sentencing Statistics 112 tbl. 43. This is substantially greater than any other drug type. *Id*. In fact, methamphetamine defendants receive the ten-year mandatory minimum sentence at a rate more than 75% higher than heroin defendants. *Id.* Thus, gram for gram, ounce for ounce, pound for pound, and kilo for kilo, methamphetamine defendants receive much harsher sentences than any other federal drug offender.

| (5) | 10 years or more, but less than 15 years | 24 |
| (6) | 5 years or more, but less than 10 years | 17 |
| (7) | More than 1 year, but less than 5 years | 12 |

*If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

U.S.S.G. § 4B1.1. The Sentencing Commission has defined "controlled substance offense" to include an offense under state law that is punishable by a term exceeding one year. *Id*. § 4B1.2(b).

The parties agree, and I find, that Newhouse is a Career Offender under § 4B1.1. Newhouse is 33 years old; her current offense is a "controlled substance offense," and she has two prior "controlled substance offenses."

Newhouse's Career Offender classification has a profound effect on her guideline offense level.[11] Pursuant to the § 4B1.1 table, Newhouse's offense level leaps from 26 to 37, an increase of 11 points. If not for the information filed by the prosecutor under § 851, thus raising the statutory maximum from 40 years to life, the offense level would be 34.

As previously noted, Newhouse qualifies for a three point reduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a)-(b). Thus, her adjusted offense level is 34. Application of the Career Offender guideline also requires that

---

[11] In 2011, 2,257 defendants were sentenced as Career Offenders and 1,630 of them were for drug offenses. U.S. Sentencing Comm'n, 2011 Sourcebook of Federal Sentencing Statistics tbl. 22 (2011). Sentencing drug defendants as career offenders has been a growing cottage industry almost tripling in fifteen years. In 1996, federal courts sentenced only 949 defendants as career offenders and 616 of them were drug offenders. U.S. Sentencing Comm'n, 1996 Sourcebook of Federal Sentencing Statistics, tbl. 22 (1996); *see also* Sarah French Russell, *Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing*, 43 U.C. DAVIS L. REV. 1135, 1173 (2010).

Newhouse's criminal history level be re-adjusted. Newhouse has seven criminal history points, resulting in a criminal history category IV. Section 4B1.1(b), however, requires that "[a] career offender's criminal history category in every case under this subsection shall be Category VI." U.S.S.G. § 4B1.1(b). Applying the Career Offender enhancement dramatically increases Newhouse's criminal history category from IV to VI. Category VI is normally reserved for defendants with 13 or more criminal history points. A total offense level 34 and a criminal history category VI mandates an advisory guideline range for Newhouse of 262-327 months. Application of the Career Offender guideline more than doubles the 120 month mandatory minimum sentence required by 21 U.S.C. §§ 841(b)(1)(B) and 851, more than quadruples the 60-month mandatory minimum sentence required under 21 U.S.C. § 841(b)(1)(B), and more than triples her guideline range (without a mandatory minimum) of 70 to 87 months.

### C.    Step 2-Determination Of Whether To Depart

In the second step of the sentencing methodology, I determine whether any traditional "departure" is appropriate, *see United States v. Washington*, 515 F.3d 861, 866 (8th Cir. 2008), that is, whether there are features of Newhouse's case that potentially take it outside the guidelines "heartland" and make it a special or unusual case warranting a departure, *see United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006); U.S.S.G. § 5K2.0; *id.* § 1A1.1, cmt. (n.4(b)). The prosecution has not sought an upward departure, and Newhouse has not sought a downward departure.

Although the Supreme Court has said that it is "not incumbent on the District Court Judge to raise every conceivably relevant issue on his own initiative," *Gall*, 552 U.S. at 54, I note that U.S.S.G. § 4A1.3(b), p.s., encourages a downward departure if the defendant's criminal history category "substantially over-represents the seriousness

of the defendant's criminal history or the likelihood that the defendant will commit further crimes." But any departure granted thereunder would be limited in this case to one criminal history category. *See* U.S.S.G. § 4A1.3(b)(3)(A). I further note that pre-*Booker*, the courts of appeals affirmed traditional departures from the Career Offender guideline, *see United States v. Collins*, 122 F.3d 1297, 1304 (10th Cir. 1997); *United States v. Reyes*, 8 F.3d 1379, 1387 (9th Cir. 1993); *United States v. Bowser*, 941 F.2d 1019, 1026 (10th Cir. 1991), and that the reason for many such departures was that the prior offenses were "minor or too remote in time to warrant consideration." Michael S. Gelacak, Ilene H. Nagel and Barry L. Johnson, *Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis*, 81 MINN. L. REV. 299, 356-57 (1996). Because the only departure motions before me are the prosecution's for substantial assistance, I will consider those motions after I consider whether to vary from the advisory guideline range. *See Coyle*, 506 F.3d at 683.

### D. Troublesome Aspects Of The Career Offender Guideline—Potential For A Policy Disagreement

#### 1. Background on policy disagreement based variances

Before turning to whether a policy-based variance from the guidelines is appropriate, some background is helpful.

In discussing grounds for a variance from the guidelines, "[i]n *Kimbrough [v. United States*, 552 U.S. 85 (2007)], the Supreme Court held that it was not an abuse of discretion for a district court to vary from the Guidelines based on its policy disagreement concerning the disparity between crack and powder cocaine sentences." *United States v. Battiest*, 553 F.3d 1132, 1137 (8th Cir. 2009) (citing *Kimbrough*, 552 U.S. at 110-111). Thus, "policy disagreements" may provide the basis for a variance

from a guidelines sentence, even in a "mine-run" case. *Kimbrough*, 552 U.S. at 109-110.

The Supreme Court took up the issue of the district court's authority to vary from guidelines sentences in *Spears v. United States*, 555 U.S. 261 (2009) (*per curiam*), which also involved the disparity between crack and powder cocaine sentences. In *Spears*, the Court explained that "the point of *Kimbrough*" is "a recognition of district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears*, 555 U.S. at 264. The Court also reiterated that a variance that is based on a policy or "categorical" disagreement with the guidelines, where the guidelines in question "'do not exemplify the Commission's exercise of its characteristic institutional role,'" are entitled to as much "respect" on appeal as a traditional "'outside the 'heartland''" departure. *Id.* (quoting *Kimbrough*, 552 U.S. at 109). Furthermore, the Court clarified, that if the sentencing court disagrees with the 100:1 ratio for crack cocaine cases, the sentencing court also necessarily has the authority to adopt some other ratio to govern a "mine-run case." *Id.* at 266. Specifically, "district courts are entitled to reject and vary categorically from the crack-cocaine guidelines based on a policy disagreement with those Guidelines." *Id.* The Court found that adopting the alternative of barring categorical variances "would likely yield one of two results":

> Either district courts would treat the Guidelines' policy embodied in the crack-to-powder ratio as mandatory, believing that they are not entitled to vary based on "categorical" policy disagreements with the Guidelines, or they would continue to vary, masking their categorical policy disagreements as "individualized determinations." The latter is institutionalized subterfuge. The former contradicts our holding in *Kimbrough*. Neither is an acceptable sentencing practice.

*Id.* at 266. The Court found, further, that the sentencing court had based its 20:1 replacement ratio on two well-reasoned decisions by other courts, which had, in turn, reflected the Sentencing Commission's expert judgment that a 20:1 ratio would be appropriate in a "mine-run case." *Id.* Not surprisingly, I paid special attention to the holding in *Spears* because the Eighth Circuit Court of Appeals had decided the case *en banc*, thus reversing the sentencing judge twice (in both the panel and *en banc* opinions), and I was that sentencing judge.

*Spears* specifically addressed only a sentencing court's authority to reject the 100:1 crack-to-powder ratio under the guidelines, categorically, and on policy grounds, and to adopt some other ratio to govern "mine-run cases." Nevertheless, the powerful implication of *Spears* is that, in other "mine-run" situations, the sentencing court may also reject guideline provisions on categorical, policy grounds—particularly when those guideline provisions "'do not exemplify the Commission's exercise of its characteristic institutional role,'" *id.* (quoting *Kimbrough*, 552 U.S. at 89)—and may, consequently, adopt some other well-reasoned basis for sentencing. Indeed, a number of federal courts of appeals have held that *Kimbrough* and *Spears* apply to policy disagreements with guidelines other than those applicable to crack cocaine. *See, e.g.*, *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011) (holding "district courts may vary from the child pornography Guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case."); *United States v. Grober*, 624 F.3d 592, 599-600 (3rd Cir. 2010) (holding that while sentencing court has authority to vary from advisory guidelines range based on its policy disagreement, when it does so it must provide "a reasoned, coherent, and sufficiently compelling explanation of the basis for [its] disagreement.") (quoting *United States v. Merced*, 603 F.3d 203, 220 (3d Cir. 2010) (internal quotation marks omitted); *United States v. Corner*, 598 F.3d 411, 415

(7th Cir. 2010) (*en banc*) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any Guideline on policy grounds—though they must act reasonably when using that power."); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("As the Supreme Court strongly suggested in *Kimbrough*, a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008) ("[*Kimbrough*] makes plain that a sentencing court can deviate from the guidelines based on general policy considerations.").

Following this line of Supreme Court precedent, the Eighth Circuit Court of Appeals, as well as other courts of appeals, held that district courts are free to vary from the Career Offender guideline based on policy disagreements with it.[12] *See United States v. Gray*, 577 F.3d 947, 950 (8th Cir. 2009) (holding that district court did not "misunderstand its authority to vary from the career-offender guideline" on the basis of

---

[12] Two courts of appeals previously held that judges could not disagree with the policy behind § 4B1.1 by reading 28 U.S.C. § 994(h) as equivalent to a directive to the courts, rather than as a directive only to the Sentencing Commission. *See United States v. Welton*, 583 F.3d 494 (7th Cir. 2009); *United States v. Vazquez*, 558 F.3d 1224 (11th Cir. 2009). The Eleventh Circuit's *Vazquez* decision was vacated and remanded by the Supreme Court, *see Vazquez v. United States*, 130 S. Ct. 1135 (2010), after the Solicitor General conceded error. *See Vazquez v. United States*, No. 09-5370, 2009 WL 5423020, at *9 (Nov. 16, 2009) (U.S. Brief) (arguing that petition should be granted and the judgment vacated and remanded for reconsideration because the "premise that congressional directives to the Sentencing Commission are equally binding on the sentencing courts . . . is incorrect," and because "all guidelines are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)"). Relying in part on this development, the Seventh Circuit Court of Appeals reconsidered, and held that, since § 994(h) is not a directive to the courts, courts are as much at liberty to disagree with it as with any other guideline. *Corner*, 598 F.3d at 415-16.

policy disagreements, thus implying that a district court has authority to vary from Career Offender guideline based on policy disagreements with it); *see also United States v. Collins*, 474 Fed. App'x 142, 144 (4th Cir. 2012); *United States v. Mitchell*, 624 F.3d 1023, 1028-30 (9th Cir. 2010); *United States v. Corner*, 598 F.3d 411, 416 (7th Cir. 2010) (*en banc*); *United States v. Michael*, 576 F.3d 323, 327-28 (6th Cir. 2009); *United States v. McLean*, 331 Fed. Appx. 151, 152 (3d Cir. June 22, 2009); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008); *United States v. Sanchez*, 517 F.3d 651, 662-63 (2d Cir. 2008).

For the reasons discussed below, I join the growing chorus of federal judges who have rejected applying the Career Offender guideline in certain cases. *See United States v. Whigham*, 754 F. Supp.2d 239, 247-48 (D. Mass. 2010) (granting downward variance on a number of grounds and noting that "there is also no question that the career offender guidelines are flawed."); *United States v. Merced*, No. 2:08-cr-000725, 2010 WL 3118393, at *4 (D.N.J. Aug. 4, 2010) (granting variance from Career Offender guideline based on defendant's specific circumstances rather than as a policy based variance); *United States v. Woody*, No. 8:09CR382, 2010 WL 2884918, at *9 (July. 20, 2010) (declining to apply Career Offender guideline because its application resulted in a sentence "excessively harsh" given defendant's offense conduct and criminal history); *United States v. Patzer*, 548 F. Supp.2d 612, 617 (N.D. Ill. 2008) (declining to apply Career Offender guideline where its application overstated the seriousness of the defendant's prior convictions and was in excess of that required for deterrence); *United States v. Moreland*, 568 F. Supp.2d 674, 688 (S.D. W. Va. 2008) (granting variance from Career Offender guideline where defendant was not "the 'repeat violent offender' nor 'drug trafficker' targeted by the career offender guideline enhancement," had not demonstrated a "pattern of recidivism or violence," and applying the Career Offender guideline resulted in unwarranted sentencing uniformity);

*United States v. Malone*, No. 04-80903, 2008 WL 6155217, at *4 (E.D. Mich. Feb. 22, 2008) (granting downward variance from Career Offender guideline because sentence under it would punish defendant "greater than necessary to achieve the objectives of sentencing" and would have an "unwarranted impact" on minority groups "'without clearly advancing a purpose of sentencing.'") (quoting U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING, AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 134 (2004)); *United States v. Fernandez*, 436 F. Supp.2d 983, 988-90 (E.D. Wisc. 2006) (declining to apply Career Offender guideline because, based on defendant's specific circumstances, it produced a guideline range "greater than necessary to satisfy the purposes of sentencing."); *United States v. Naylor*, 359 F. Supp. 2d 521, 524 (W.D. Va. 2005) (declining to impose Career Offender guideline due to defendant's young age when he committed the predicate offenses); *United States v. Serrano*, No. 04CR.424-19(RWS), 2005 WL 1214314, at *8 (S.D.N.Y. May 19, 2005) (imposing "non-guideline sentence" where defendant's Career Offender predicate offenses were all minor drug offenses for which defendant had never spent more than one year in prison); *United States v. Carvajal*, No. 04CR222AKH, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005) (finding Career Offender guideline resulted in sentences "excessive, in light of the nature of [defendant's] recidivism, for the Guidelines for Career Offenders are the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria."); *cf. United States v. Poindexter*, 550 F. Supp. 2d 578, 580-81 (E.D. Pa. 2008) (noting that sentencing court did not apply Career Offender guideline because it "determined that the career offender designation 'overrepresents the total offense level in this case'").

## 2.     *Flaws in the Career Offender Guideline*

I turn now to a discussion of my quasi-categorical policy disagreements with the Career Offender guideline when applied to a defendant, like Newhouse, who is a non-violent, recidivist drug addict occupying a low-level role in the drug trade in order to obtain drugs for her addiction.  I use the phrase "quasi-categorical" because I recognize that some offenders have earned Career Offender status and should be sentenced within the Career Offender guideline, and, in rare instances, higher.

### a.     *A flawed creation*

### i.     *The Sentencing Commission's institutional role*

The Sentencing Reform Act of 1984 ("SRA"), a chapter of the Comprehensive Crime Control Act of 1984, Pub. L. 98-473, 98 Stat. 2068, created the Sentencing Commission.[13]  *See Dorsey v. United States*, 132 S. Ct. 2321, 2326 (2012); *Southern Union Co. v. United States*, 132 S. Ct. 2344, 2358 (2012).  The SRA directed the Sentencing Commission to enact sentencing guidelines that would meet the purposes of sentencing set forth in § 3553(a)(2), provide fairness, reduce unwarranted disparities, maintain sufficient flexibility to permit individualized sentences, and reflect advancement in knowledge of human behavior.  Pub. L. No. 98-473, §§ 217(a), 239, 98 Stat. 1987 (1984); 28 U.S.C. § 991(b)(1).  The SRA further directed the Sentencing Commission to "develop means of measuring the degree to which the [guidelines] are effective in meeting the purposes of sentencing," 28 U.S.C. § 991(b)(2), and was

---

[13] The Comprehensive Crime Control Act was a lengthy piece of legislation that revised many other aspects of the federal criminal justice system including the penalty schemes for federal drug offenders, bail reform measures, and the establishment of a crime victims fund. *See* Controlled Substances Penalties Amendments Act,  Pub.L. 98-473, Tit. II, ch. V, 98 Stat. 2068 (penalty scheme revisions); the Bail Reform Act of 1984. Pub.L. 98-473, Tit. II, ch. I, 98 Stat. 1976 (bail); and Victims of Crime Act of 1984, Pub.L. 98-473, Tit. II, ch. XIV, 98 Stat. 2170 (creation of crime victims fund).

granted extensive research powers to do so.[14]  28 U.S.C. § 995(a)(12)-(16).  According to Justice Breyer, writing for the majority in *Rita*, the Sentencing Commission developed the first set of guidelines through an empirical approach, examining 10,000 presentence reports, and determining average sentences imposed before the guidelines, *Rita*, 551 U.S. at 349, and that, as directed in 28 U.S.C. § 994(p), the Sentencing Commission could revise the guidelines thereafter by studying federal court decisions and seeking advice from prosecutors, law enforcement personnel, defense counsel, civil liberties groups, and experts.[15]  *Id*. at 350.  "The result is a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice."  *Id*.

The Sentencing Commission has at times strayed from the "characteristic institutional role" described in the SRA and by the Court in *Rita*, and, when it has, the resulting guidelines are unlikely to properly reflect § 3553(a) considerations.  *See Kimbrough*, 552 F.3d at 101-02.  *Kimbrough* provides an example of a guideline that

---

[14] As Justice Breyer recognized in his concurrence in *Pepper*:

> The trial court typically better understands the individual circumstances of particular cases before it, while the Commission has comparatively greater ability to gather information, to consider a broader national picture, to compare sentences attaching to different offenses, and ultimately to write more coherent overall standards that reflect nationally uniform, not simply local, sentencing policies.

*Pepper*, 131 S. Ct. at 1254 (Breyer, J., concurring in part and concurring in the judgment).

[15]As the Court explained in *Kimbrough*, one of the Sentencing Commission's institutional strengths is its capacity to base "determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 109 (internal citation and quotation marks omitted).

was not a product of the Sentencing Commission's expertise. In *Kimbrough*, the Supreme Court found that the guidelines' 100:1 powder/crack ratio was not based on the Sentencing Commission's empirical research, but, instead, was simply borrowed from the ratio Congress used to set minimum and maximum sentences in the Anti–Drug Abuse Act of 1986. *Id.* at 95–96. In turn, the Anti-Drug Abuse Act's ratio was based on Congress's mere assumptions regarding the relative dangerousness of crack. *Id.* at 95. After adopting the 100:1 ratio in the original guidelines, the Sentencing Commission's research revealed that many of the assumptions used to justify the 100:1 ratio were baseless. *Id.* at 97–98. As a result, the Sentencing Commission attempted to amend the guidelines to reduce the ratio to 1:1, but Congress blocked this attempt pursuant to 28 U.S.C. § 994(p), which provides that guideline amendments become effective unless disapproved by Congress. *Id.* at 99. Given that the 100:1 ratio was expressly contrary to the Sentencing Commission's own research, the Court held that the ratio did not "exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109.

As with the crack cocaine guideline, the Sentencing Commission strayed from its institutional role with the Career Offender guideline, albeit in both its creation and expansion. A subject I explore next.

### ii. *Flawed origins and expansions of the Career Offender guideline*

The Career Offender guideline arose from Congress's statutory directive to the Sentencing Commission to set higher guideline ranges for "certain felony recidivists."[16]

---

[16] Enhanced sentencing for recidivists is hardly a concept new to the United States Sentencing Guidelines. The third book of the Old Testament, Leviticus, recognized an enhanced punishment of seven times for a series of rules not previously obeyed: "And if ye will not yet for all this hearken vnto me, then I will punish you seuen times more for your sinnes." 26 *Levitcus* 18 (King James (1611)).

*See United States v. Coleman*, 635 F.3d 380, 382 (8th Cir. 2011). Specifically, Congress was interested in targeting "repeat drug traffickers" and "repeat violent offenders." S. Rep. No. 98-225, at 175 (1983).[17] The Congressional view at the time

---

[17] As former Judge Nancy Gertner recently pointed out, Congress did not intend the Career Offender guideline to corral low-level drug dealers or users like Newhouse, but rather drug trafficking offenders involving large amounts of narcotics. *Whigham*, 754 F. Supp. 2d at 248. Judge Gertner wrote:

> While there is no question that Whigham is a Career Offender under the Guidelines, § 4B1.1, there is also no question that the career offender guidelines are flawed. The offenses that put Whigham in the career offender category are drug offenses—low level, litigated largely in the district court, without violence or guns. As I have said elsewhere, there are career offenders and there are career offenders. There are offenders who qualify for career offender treatment because of a life of violent crime. There are others who meet the Guidelines standard, like Whigham, because of a series of very minor drug charges.

> Long before *Booker*, the case law recognized that in many cases the career offender guidelines in fact overstated a defendant's culpability; that it swept into one category wholly dissimilar offenders, such as drug offenders who have a much lower recidivism rate than violent offenders.

> While 28 U.S.C. § 994(h) directed the Sentencing Commission to promulgate the career offender provisions, Whigham is hardly the kind of individual that Congress had in mind. Congress' directive for a harsh career offender penalty—as applied to a drug felony—was very clearly aimed at "drug trafficking offense[s]" involving large amounts of narcotics. *See* S.Rep. No. 98–225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, at 3196. Their targets were those making substantial amounts of money who were flight risks because they could easily post "bond

was that drug trafficking was an "extremely lucrative" enterprise "carried on to an unusual degree by persons engaged in continuing patterns of criminal activity," and that "drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country." *Id.* at 20, 213, 256. With this Congressional mindset, § 994(h) of Title 28, enacted as part of the SRA, directed:

> The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
>
>> (1) has been convicted of a felony that is—
>>
>>> (A) a crime of violence; or
>>>
>>> (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46; and
>>
>> (2) has previously been convicted of two or more prior felonies, each of which is—
>>
>>> (A) a crime of violence; or
>>>
>>> (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the

---

> in the hundreds of thousands of dollars" and flee to a country where they "have established substantial ties outside the United States from whence most dangerous drugs are imported." *Id.* at 3203. Whigham does not remotely fit this portrait. He is a petty dealer . . . .

*Id.* at 247-48 (citations and footnote omitted).

> Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.

28 U.S.C. § 994(h).[18]

For reasons unknown, the Sentencing Commission did not follow the plain terms of this statutory directive. An early version of the Career Offender guideline, published for public comment, provided: "The controlled substance offenses covered by this provision are identified in 21 U.S.C. § 841; 21 U.S.C. §§ 952(a), 955, 955a [later codified at 46 U.S.C. § 70503], 959; and in §§ 405B and 416 of the Controlled Substance Act as amended in 1986." *See* 52 Fed. Reg. 3920 (Feb. 6, 1987). This version was faithful to the statutory directive in § 994(h). However, this version was not adopted. Instead, since its first official set of sentencing guidelines, the Sentencing Commission has repeatedly expanded the list of qualifying drug offenses by adding numerous state and federal drug offenses to those listed in § 994(h).[19] To date, the following drug trafficking offenses have been added to the offenses in § 994(h):

---

[18] The Senate Judiciary Committee explained that:

> Subsection (h) was added to the bill in the 98th Congress to replace a provision proposed by Senator Kennedy enacted in S. 2572, as part of proposed 18 U.S.C. § 3581, that would have mandated a sentencing judge to impose a sentence at or near the statutory maximum for repeat violent offenders and repeat drug offenders. The Committee believes that such a directive to the Sentencing Commission will be more effective; the guidelines' development process can assure consistent and rational implementation of the Committee's view that substantial prison terms should be imposed on repeat violent offenders and repeat drug offenders.

S. Rep. No. 98-225, at 175 (1983).

[19] This expansion is well-chronicled by Baron-Evans and her colleagues:

11/1/87: "Controlled substance offense" was defined in the initial guideline as "an offense identified in" the federal statutes enumerated in § 994(h), and also § 845b (employing persons under 18, later transferred to § 861), § 856 (maintaining drug involved premises), "and similar offenses." U.S. Sentencing Guidelines Manual § 4B1.2(2) (1987). The commentary explained that this included "the federal offenses identified in the statutes referenced in § 4B1.2, or substantially equivalent state offenses," that these offenses "include" manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute or dispense a controlled substance or counterfeit substance, and also aiding and abetting, conspiring or attempting to commit such offenses. Id. at cmt. n.2. . . . .

1/15/88: The covered offenses were broadened through the commentary by changing "the federal offenses identified in the statutes referenced in § 4B1.2, or substantially equivalent state offenses" to "any federal or state offense that is substantially similar to any of those listed in" § 4B1.2. Importing and possessing with intent to import were added to the commentary. *See* App. C, Amend. 49 (1988); U.S. Sentencing Guidelines Manual § 4B1.2, cmt. n.2 (1988). . . .

11/1/89: The covered offenses were broadened by deleting all reference to identified federal offenses from the guideline and defining "controlled substance offense" in the guideline itself as "an offense under a federal or state law prohibiting the manufacture, import, export, or distribution of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, or distribute." *See* App. C, Amend. 268 (1989); U.S. Sentencing Guidelines Manual § 4B1.2(2) (1989). This

amendment also arguably narrowed the offenses by deleting 21 U.S.C. §§ 856 and 861 and omitting "dispensing." Aiding and abetting, attempt, and conspiracy were retained in the commentary. *Id.* at cmt. n.1.

11/1/91: "Dispensing" was added back in, to make the definition "more comprehensive." *See* App. C, Amend. 433 (1991); U.S. Sentencing Guidelines Manual § 4B1.2(2) (1991).

. . . .

11/1/97: The Commission specified five offenses. . . .

Unlawfully possessing a listed chemical with intent to manufacture a controlled substance, 21 U.S.C. § 841(d)(1) [now 21 U.S.C. § 841(c)(1)], and unlawfully possessing a prohibited flask or equipment with intent to manufacture a controlled substance, 21 U.S.C. § 843(a)(6), were added. . . . The Reason for Amendment was that it was the Commission's "view that there is such a close connection between possession of a listed chemical or prohibited flask or equipment with intent to manufacture a controlled substance and actually manufacturing a controlled substance that the former offenses are fairly considered as controlled substance trafficking offenses." *See* U.S. Sentencing Guidelines Manual App. C, Amend. 568 (1997) (emphasis added).

Maintaining a place for the purpose of facilitating a drug offense, 21 U.S.C. § 856, using a communications facility in committing, causing, or facilitating a drug offense, 21 U.S.C. § 843(b), and possessing a firearm during and in relation to a crime of violence or drug offense, 18 U.S.C. § 924(c) were added with the proviso that the offense of conviction must have established that the

(1) inchoate offenses—aiding and abetting, attempt, conspiracy

(2) any state offense punishable by more than one year

(3) "[u]nlawfully possessing a listed chemical with intent to manufacture a controlled substance," 21 U.S.C. § 841(c)(1)

(4) "[u]nlawfully possessing a prohibited flask or equipment with intent to manufacture a controlled substance," 21 U.S.C. § 843(a)(6)

(5) "[m]aintaining any place for the purpose of facilitating a controlled substance offense," 21 U.S.C. § 856, "if the offense of conviction established that the underlying offense (the offense facilitated) was a 'controlled substance offense'"

(6) "[u]sing a communications facility in committing, causing or facilitating a drug offense," 21 U.S.C. § 843(b), "if the offense of conviction established that the underlying offense (the offense committed, caused or facilitated) was a 'controlled substance offense'"

(7) a "violation of 18 U.S.C. § 924(c) or § 929(a) . . . if the offense of conviction established that the underlying offense was a . . . 'controlled substance offense.'"

Baron-Evans *et. al*, *Deconstructing the Career Offender Guideline*, 2 Charlotte L. Rev. at 56-57 (quoting U.S. Sentencing Guidelines Manual § 4B1.2, cmt. n.1 (2009)). None of the reasons for amendment reference any empirical studies, sentencing data, or

---

underlying offense was a "controlled substance offense" or a "crime of violence."

Baron-Evans *et. al*, *Deconstructing the Career Offender Guideline*, 2 Charlotte L. Rev. at 53-56.

other indicia of national experience that would support subjecting additional, and less serious, offenders to the severe Career Offender guideline than Congress specified.

The Career Offender guideline is further flawed through the operation of 21 U.S.C. § 851. As in this case, the prosecutor can decide in his or her sole discretion whether to file an information under § 851, which raises the statutory maximum and, in turn, the offense level under the Career Offender table. In 1994, the Sentencing Commission sought to rectify this problem with an amendment that would have excluded any increase in the maximum term under 21 U.S.C. §§ 841 and 851, explaining that the amendment "avoids unwarranted double counting as well as unwarranted disparity associated with variations in the exercise of prosecutorial discretion in seeking enhanced penalties based on prior convictions." U.S. SENTENCING GUIDELINES MANUAL App. C, Amend. 506 (1994). The Supreme Court invalidated the amendment because, it said, it was "at odds with § 994(h)'s plain language," in particular, the phrase "maximum term authorized." *United States v. LaBonte*, 520 U.S. 751, 757 (1997).[20]

Thus, unlike the guidelines development process described in *Rita*, the Sentencing Commission did not use empirical data of average sentences, pre-guidelines, as the starting point for the Career Offender guideline. *See* 28 U.S.C. § 994(m); S. Rep. No. 98-225, at 116 (1983) (noting that under the sentencing guidelines "the average time served should be similar to that served today in like cases"). Instead, as the Sentencing Commission said, "much larger increases are provided for certain repeat offenders, consistent with legislative direction" than under pre-guidelines practice. *See* U.S. Sentencing Commission, *Supplementary Report on the Initial Sentencing*

---

[20] The Sentencing Commission then amended the commentary to include any increase in the statutory maximum based on the defendant's prior criminal record. *See* U.S. SENTENCING GUIDELINES MANUAL App. C, Amend. 567 (1997).

*Guidelines and Policy Statements* 44 (1987), *available at* http://www.src-project.org/wp-content/pdfs/reports/USSC_Supplementary%20Report.pdf. As a result, the Career Offender sentencing ranges were set at or near the maximum term, regardless of whether the resulting sentences met the purposes of sentencing, created unwarranted disparity, or conflicted with the "parsimony provision" of § 3553(a), which directs judges to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

The amendments to the Career Offender guideline did not rectify these failings, but only multiplied them by greatly expanding the drug offenses that qualified as predicate drug crimes.[21] The amendments added drug offenses which were untethered from the requirements of § 994(h) and not the product of any study, empirical research, or sentencing data,[22] though the sentencing data clearly indicated there was a problem. *See* Michael S. Gelacak, Ilene H. Nagel, and Barry L. Johnson, *Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis*, 81 Minn. L. Rev. 299, 356-57 (1996) (Commission study found "extensive use of [downward]

---

[21] This expansion in the number of qualifying predicate drug offenses dovetailed with Congress's expansion of the number of federal criminal statutes that prescribed a mandatory minimum sentence. *See* Ricardo H. Hinojosa, Chair, United States Sentencing Commission, *Statement Before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security*, 110th Cong. 6 (June 26, 2007), *available at* http://judiciary.house.gov/hearings/printers/110th/ 36343.pdf (noting the Sentencing Commission's finding that there are "at least 171 mandatory minimum provisions in Federal criminal statutes.").

[22] It may be, as *amicus* argues, that in expanding the predicates beyond those "described in" 28 U.S.C. § 994(h), the Sentencing Commission violated the plain language of a specific directive of Congress, *United States v. LaBonte*, 520 U.S. 751, 757 (1997), because when a statute refers to offenses "described in" specific sections of the criminal code, it means those specific offenses. *See Nijawan v. Holder*, 557 U.S. 29, 36-37 (2009). I need not decide whether the Career Offender guideline is invalid, however, because I have discretion to vary from it.

departures from sentences generated by the career offender guideline" that were "quite substantial" and often because the predicates were "minor or too remote in time to warrant consideration").

Thus, I reject the prosecution's suggestion that the Career Offender guideline results from Congress's and the Sentencing Commission's "thoughtful consideration." Instead, I find that the Career Offender guideline results from an imprecisely implemented congressional mandate and is entitled to considerably less deference than those guidelines where the Sentencing Commission has exercised its institutional expertise and utilized empirical analysis. Even giving the Career Offender guideline less deference than other guidelines, as I explained earlier, I do not have a categorical policy disagreement with the Career Offender guideline, rather, a quasi-categorical policy disagreement with it when applied to low-level, non-violent drug addicts. Sometimes, the Career Offender guideline, even with all its identified flaws, arrives at a sentencing range that fulfills the overarching purpose of sentencing—imposing "a sentence sufficient but not greater than necessary, to comply with the purposes" of federal sentencing. *See* 18 U.S.C. § 3553(a). But, particularly when applied to low level, non-violent drug addicts, it all too often arrives at a sentencing range that is in acuminous conflict with the § 3553(a) factors and with a just and fair sentence. When this happens, we as federal sentencing judges should be mindful of Judge McConnell's wise observation in applying the Career Offender guideline:

> It follows that district courts should not be overly shy about concluding that particular defendants, even if third-time drug sellers, do not have the profile Congress and the Commission had in mind when they directed that sentences for career drug offenders be set at or near the top of the statutory range. *Booker* discretion is at its zenith when sentencing courts make the judgment that the particular conduct of the defendant falls only marginally within the

> scope of a guideline that even the Commission regards as
> overbroad and (in some applications) counter-productive.

*United States v. Pruitt*, 502 F.3d 1154, 1172 (10th Cir. 2007) (McConnell, J., concurring), *vacated for reconsideration*, 532 U.S. 1306 (2008). This is mandated not only by the Supreme Court but by Congress when it passed the § 3553(a) factors. Implementing my quasi-categorical policy disagreement with U.S.S.G. § 4B1.1 requires a case by case analysis and careful application of the § 3553(a) factors.

### b.    *Failing to promote the goals of sentencing*

The prosecution argues that the Career Offender guideline promotes the goals of sentencing. On the contrary, I find that, as a result of the flaws in the creation of the Career Offender guideline and its repeated expansion of predicate drug offenses untethered from the requirements of § 994(h), the Career Offender guideline frequently fails to promote the goals of sentencing outlined in 18 U.S.C. § 3553(a). What follows is an examination of the Career Offender guideline's failings in the promotion of the goals of sentencing, particularly with respect to low-level, non-violent drug addicts who often engage in drug trafficking solely to satisfy their drug addiction.

### i.    *Just punishment in light of the seriousness of the offense*

One purpose of sentencing is to provide "just punishment" in light of the "seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A). Low-level, non-violent drug addicts who participate in the drug trade to support their habits are hardly the kind of individuals Congress had in mind when it directed the Sentencing Commission to promulgate the Career Offender guideline. Congress's directive was clearly aimed at "drug trafficking offense[s]" involving large amounts of drugs. *See* S. REP. NO. 98-225 at 175 (1983). Low-level, non-violent drug addicts are not drug kingpins engaged in repeated and "extremely lucrative" drug trafficking as envisioned by Congress. On

the contrary, they occupy the opposite end of the spectrum of the drug universe, low-level cogs in the drug trade, who are readily replaced following their arrest. *See* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING, AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 134 (2004).

### ii. *Protecting the public against further crimes of the defendant*

Another purpose of sentencing is to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). This purpose turns on "'the likelihood that [the defendant] will . . . commit crimes in the future,'" *United States v. Burroughs*, 613 F.3d 233, 243 (D.C. Cir. 2010) (internal citation omitted), and is a function of two variables: predicting the likelihood that the offender will commit further offenses and assessing the potential seriousness of those offenses. *See United States v. Boyd*, 475 F.3d 875, 877–78 (7th Cir. 2007) (observing that "[d]angerousness is a function of the magnitude of the harm that will occur if danger materializes and the probability that it will materialize"). The prosecution argues that the Career Offender guideline promotes this goal. I disagree.

Application of the Career Offender guideline has a strong potential to overstate the seriousness of a defendant's record and the risk of his or her re-offending, particularly when the defendant is a low-level, non-violent drug addict. The Sentencing Commission, in its Fifteen Year Report, found that the Career Offender guideline can produce sentences greater than necessary to satisfy the purposes of sentencing, particularly where it is based on minor drug offenses. The Sentencing Commission observed:

> The question for policymakers is whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of

sentencing. Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. . . .

Most importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent. The recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the Guidelines Manual. The career offender guideline thus makes the criminal history category a less perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses.

U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING, AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 134 (2004) (emphasis in original). *See also Pruitt*, 502 F.3d at 1167-68 (McConnell, J., concurring) (noting that the Sentencing Commission criticized "the sweep" of the Career Offender guideline in its Fifteen Year Report); *United States v. Steward*, 339 Fed. Appx. 650, 653 (7th Cir. 2009) (reversing career offender sentence where district court failed to consider defendant's well-supported argument based in part on the Sentencing Commission's Fifteen Year Report); *Malone*, No. 04-80903, 2008 WL 6155217, at *2, 4 (declining to apply the

Career Offender guideline, relying, in part, on the Sentencing Commission's Fifteen Year Report).

Thus, as the Sentencing Commission found, the category VI designation required by the Career Offender guideline does not accurately reflect the risk of recidivism for career offenders who qualify on the basis of prior drug convictions. Moreover, "the Commission itself recognizes that the career offender provision—at least to the extent that it is triggered by prior drug convictions—may contribute to racial disparity and is not clearly justified by the purposes of sentencing." Sarah French Russell, *Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing*, 43 U.C. DAVIS L. REV. at 1176.

Thus, because application of the Career Offender guideline has the strong potential to overstate the seriousness of a defendant's criminal history and the risk of his or her re-offending, the Career Offender guideline fails to promote the goal of protecting the public from further crimes. This is especially true when the Career Offender guideline is applied to low-level, non-violent drug addicts because such individuals' criminal histories are apt to be made up of relatively minor, non-violent, drug crimes fueled by their drug addiction.

### iii. Deterrence

Another purpose of sentencing is general deterrence. 18 U.S.C. § 3553(a)(2)(B). The prosecution contends that the Career Offender guideline also promotes this goal. I disagree. The Sentencing Commission has recognized, "retail level drug traffickers are readily replaced by new drug sellers so long as the demand remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else." U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING, AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING

REFORM 134 (2004).  Other researchers have found that, for drug offenders, variations in sentence type and length "ha[d] no detectable effect on rates of re-arrest" over a four-year time frame.  *See* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357, 358, 359-60 (2010); *see also* U.S. Department of Justice, *An Analysis of Non-Violent Drug Offenders With Minimal Criminal Histories*, executive summary (1994) (reporting that non-violent drug offenders with little criminal history are deterred by a short prison sentence as well as a long one).[23]  Thus, applying the Career Offender guideline to low-level, non-violent drug addicts results in sentences significantly greater than necessary to achieve the sentencing goal of deterring further crimes.

### iv.      *Rehabilitation in the most effective manner*

The final purpose of sentencing is to provide the defendant with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  The Career Offender guideline as applied to low-level, non-violent drug addicts fails to recognize that drug treatment works to rehabilitate offenders and thus reduce recidivism.  *See, e.g.*, Nat'l Institute on Drug Abuse, Nat'l Institutes of Health, *Principles of Drug Abuse Treatment for Criminal Justice Populations* (2006) ("[T]reatment offers the best alternative for interrupting the drug abuse/criminal justice cycle for offenders with drug abuse problems. . . . Drug abuse treatment is cost effective in reducing drug use and bringing about associated healthcare, crime, and incarceration cost savings" because every dollar spent toward effective treatment programs yields a four to seven dollar return in

---

[23] Available at https://www.ncjrs.gov/pdffiles1/Digitization/147721NCJRS.pdf.

reduced drug-related crime, criminal costs and theft.).[24] "[S]tatistics suggest that the rate of recidivism is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting." *United States v. Perella,* 273 F. Supp. 2d 162, 164 (D. Mass. 2003) (citing Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders*, 53 Hastings L.J. 1217, 1220 (2002)); s*ee* Elizabeth K. Drake, Steve Aos, & Marna G. Miller, *Evidence-Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State*, tbl.1 (2009) (finding that treatment-oriented intensive supervision reduced recidivism by 17.9%; drug treatment in prison reduced recidivism by 6.4%; drug treatment in the community reduced recidivism by 8.3%).[25]

### v.    Unwarranted sentencing disparities—unwarranted uniformity

Section 3553(a) also requires a sentencing court to consider the need to avoid unwarranted sentencing disparities. *See Pepper*, 131 S. Ct. at 1247; *Spears*, 555 U.S. at 842; *United States v. Gasaway*, 684 F.3d 804, 807 (8th Cir. 2012); *United States v. Munjak*, 669 F.3d 906, 907-08 (8th Cir. 2012).

I must weigh "sentencing practices in other courts" against "the other § 3553(a) factors and any unwarranted disparity created by the [guideline] itself." *Kimbrough*,

---

[24] Available at http://www.drugabuse.gov/sites/default/files/podat_cj_2012.pdf. *See also* Doug McVay, Vincent Schiraldi, & Jason Ziedenberg, Justice Policy Institute Policy Report, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Drug Treatment Versus Imprisonment* 5-6 (2004) ("Dollar for dollar, treatment reduces the societal costs of substance abuse more effectively than incarceration does."); *see also id.* at 18 ("A prison setting is ill-suited for the most effective approach to persistent drug abuse, which consists of a broad framework of substance abuse counseling with "job skill development, life skills training, [and] mental health assessment and treatment.").

[25] Available at http://www.wsipp.wa.gov/rptfiles/09-00-12-1.pdf.

552 U.S. at 108. The Sentencing Commission reported that in fiscal year 2011, only 39.9% of defendants subject to the Career Offender guideline were sentenced within it. Only 1.1% were sentenced above the range. Judges departed or varied below the range in 26.6% of cases without a prosecution motion, and in 38.4% of cases with a prosecution motion. The high rate of below-guideline sentences indicates widespread dissatisfaction with the severity of the Career Offender guideline by both judges and prosecutors.[26]

At the same time, I have a quasi-categorical policy disagreement with the Career Offender guideline in part because its application has the strong potential to lead to two distinct types of unwarranted sentencing disparities: (1) unwarranted sentencing uniformity, and (2) unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. I will discuss each of these sentencing disparities in turn.

Application of the Career Offender guideline can result in unwarranted sentencing uniformity, a type of unwarranted disparity. *See* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 AM. CRIM. L. REV. 19, 83 (2003); Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem Is Uniformity, Not Disparity*, 29 AM. CRIM. L. REV. 833, 851-71 (1992). This is because the Career Offender guideline does not distinguish between defendants, convicted of the same drug offense, based on either the seriousness of their current offense or their prior convictions. The Career Offender guideline makes no distinction based on the roles of the defendants. As a result, two defendants, one a low-level drug mule, and the other the head of a drug conspiracy employing the defendant drug mule, are treated the same.

[26] E-mail from Timothy Drisko, Research Data Coordinator, U.S. Sentencing Comm'n, to Mark W. Bennett (Jan. 8, 2013, 12:47 CST).

Both defendants would be placed in criminal history category VI and placed at the same offense level. Moreover, the Career Offender guideline makes no distinction based on the seriousness of a defendant's previous convictions. As a result, a defendant twice convicted of selling a single marijuana cigarette is treated identically to a defendant who has two convictions for trafficking tons of marijuana.

I am not the first federal judge to notice this imperfection in the Career Offender guideline. As one district court astutely observed:

> This factor initially seems to encourage deference to the Guideline range, because the Guidelines were developed to eliminate unwarranted sentencing disparities in federal courts. In practice, however, the focus of the Guidelines has gradually moved beyond elimination of unwarranted sentencing disparities and toward the goal of eliminating all disparities. As I have stated previously, this outcome is not only impractical but undesirable.

> The career offender provisions of the Guidelines, as applied to this case, perfectly exhibit the limits of a Guideline-centric approach. Two relatively minor and non-violent prior drug offenses, cumulatively penalized by much less than a year in prison, vaulted this defendant into the same category as major drug traffickers engaged in gun crimes or acts of extreme violence. The career offender guideline provision provides no mechanism for evaluating the relative seriousness of the underlying prior convictions. Instead of reducing unwarranted sentencing disparities, such a mechanical approach ends up creating additional disparities because this Guideline instructs courts to substitute an artificial offense level and criminal history in place of each individual defendant's precise characteristics. This substitution ignores the severity and character of the predicate offenses.

*Moreland*, 568 F. Supp. 2d at 688 (footnote omitted); *see United States v. Carvajal*, No. 04CR222AKH, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005) (observing that

"the Guidelines for Career Offenders are the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria.").

This hiccup in the Career Offender guideline also comes as no surprise to the Sentencing Commission, which long ago was informed of this flaw. Almost a quarter century ago, the Sentencing Commission was told:

> [T]he [career offender] guideline is potentially over-inclusive. It makes no distinction between defendants convicted of the same offenses, either as to the seriousness of their instant offense or their previous convictions. For example, two defendants convicted of the same federal drug felony [e.g., 21 U.S.C. § 841(a)(1)], each with two prior drug offenses, would be subject to the same career offender sanction, even if one defendant was a drug 'kingpin' with serious prior offenses, while the other defendant was a low-level street dealer whose two prior convictions for distributing small amounts of drugs resulted in actual sentences of probation.

U.S. Sentencing Comm'n, Memorandum from Gary J. Peters to all United States Sentencing Commissioners 13 (March 25, 1988), *available at* http://www.src-project.org/wp-content/uploads/2009/08/ussc_report_careeroffender_19880325.pdf.

The Supreme Court reiterated in *Pepper* that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper*, 131 S. Ct. at 1239-40 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). The Career Offender guideline runs counter to both this tradition and the goals of sentencing by its serious potential to create unwarranted sentencing disparities through unwarranted sentencing uniformity.

### vi. Unwarranted sentencing disparities—similarly situated defendants

"A just legal system seeks not only to treat different cases differently but also to treat like cases alike. Fairness requires sentencing uniformity as well as efforts to recognize relevant sentencing differences." *Pepper*, 131 S. Ct. at 1252 (Breyer, J., concurring in part and concurring in the judgment). The Career Offender guideline, however, runs counter to this principle by potentially creating unwarranted sentencing disparities among defendants who have been found guilty of the same criminal conduct. For example, take the hypothetical case of two partners in a conspiracy to distribute 10 grams of pure methamphetamine, Dick and Jane. Based on the methamphetamine quantity, the base offense level is 26. *See* U.S.S.G. § 2D1.1(c) (7). Each defendant pleads guilty and qualifies for a three point reduction for acceptance of responsibility. *See* U.S.S.G. §§ 3E1.1(a)-(b). Each defendant has two prior convictions resulting in four criminal history points. However, one of the defendants, Jane, was twice convicted of selling an ounce of marijuana, resulting in her being a Career Offender. The following chart compares, without applying the Career Offender guideline, Dick and Jane's criminal histories, offense levels, and sentencing ranges.

| Defendant | Criminal History | Offense Level | Sentencing Range |
|-----------|------------------|---------------|------------------|
| Dick | III | 23 | 57-71 |
| Jane | III | 23 | 57-71 |

Before applying the Career Offender guideline, both defendants have identical criminal histories, offense levels, and sentencing ranges. As the following chart demonstrates, application of the Career Offender guideline to Jane drastically changes this picture.

| Defendant | Criminal History | Offense Level | Sentencing Range |
|-----------|------------------|---------------|------------------|
| Dick | III | 23 | 57-71 |
| Jane | VI | 34 | 262-327 |

Application of the Career Offender guideline doubles Jane's criminal history, increases her offense level by over 47%, and more than quadruples her sentencing range. Operation of the Career Offender guideline in this hypothetical case results in the ludicrous possibility of Jane receiving between triple and six-fold Dick's sentence. Such an outcome clearly demonstrates that the Career Offender guideline has the grave potential of running counter to the goals of sentencing by its potential to create unwarranted sentencing disparities among defendants who have been found guilty of the same criminal conduct.

### vii.    Promoting respect for the law

When formulating the guidelines, the Sentencing Commission is to take into account "the public concern generated by the offense" and the "community view of the gravity of the offense." 28 U.S.C. § 994(c)(5), (6). A sentencing court must also take into account the need for the sentence imposed to reflect "just punishment" and to "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). The prosecution asserts that application of the Career Offender guideline promotes this goal. I disagree.

In a public opinion survey conducted on behalf of the Sentencing Commission in 1997, "there was little support for sentences consistent with most habitual offender legislation. To be sure, longer previous criminal records led to longer sentences, but at substantially smaller increments than under such initiatives as 'three-strikes-and-you're out.'" Press Release, U.S. Sentencing Comm'n, Public Opinion on Sentencing Federal Crimes (March 17, 1997) (quoting executive summary prepared by Peter H. Rossi &

Richard A. Berk), *available at* http://www.ussc.gov/Research/Research_Projects/Surveys/19970314_Public_Opinion_on_Sentencing/JP_EXSUM.htm. Application of the Career Offender guideline results in many low-level, non-violent drug addicts serving sentences grossly disproportionate to their role and culpability and hardly promotes respect for the law. Quite the opposite, totally disproportionate, unduly harsh sentences breed disrespect for the law. As the Supreme Court observed in *Gall*:

> a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.

*Gall*, 552 U.S. at 54 (quoting with approval the reasoning of the district court); see also *United States v. Deegan*, 605 F.3d 625, 655 (8th Cir. 2010 (Bright, J., dissenting) (observing that harsh federal punishment when compared to lenient state sentencing for the same criminal activity "promotes disrespect for the law and the judicial system."); *United States v. Ontiveros*, 07–CR–333, 2008 WL 2937539, at *3 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law].");  *Cf. United States v. Irey*, 612 F.3d 1160, 1239 (11th Cir. 2010) (Hill, J., concurring) (noting that "[u]nwarranted sentencing disparity breeds disrespect for the rule of law . . . ."); *United States v. Stern*, 590 F. Supp. 2d 945, 957 (N.D. Ohio 2008) ("Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake."). Thus, careful application of the § 3553(a) factors is imperative and pivotal in providing just punishment promoting respect for the law.

### E. Step 3- Application Of The § 3553(a) Factors

#### 1. Overview of § 3553(a)

The third step in the sentencing methodology requires that I apply the § 3553(a) factors to determine whether to impose a guideline or non-guideline sentence. The prosecution argues that application of the § 3553(a) factors does not warrant a downward variance for Newhouse. I disagree. Section 3553(a) lists the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for—(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . (5) any pertinent policy statement . . . issued by the Sentencing Commission . . .; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7) (line breaks omitted).

The Eighth Circuit Court of Appeals has held "[t]he district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Bridges*, 569 F.3d 374, 379 (8th Cir. 2009); *see United States v. Chaika*, 695 F.3d 741, 746 (8th Cir. 2012). In considering the § 3553(a) factors, "[a] district court is not required

to recite each of the sentencing factors under 18 U.S.C. § 3553(a), as long as the record makes clear that they were considered." *United States v. Powills*, 537 F.3d 947, 950 (8th Cir. 2008); *see United States v. Gasaway*, 684 F.3d 804, 807-08 (8th Cir. 2012) ("'The district court is presumed to know the law in regard to sentencing and need not recite each factor to be upheld. When we review the § 3553(a) factors, we will look to the entire record.'") (quoting *United States v. Keating*, 579 F.3d 891, 893 (8th Cir. 2009) (internal citation omitted)). Nevertheless, I will expressly consider each of the § 3553(a) factors in turn.

### 2. *The nature and circumstances of the offense*

The first § 3553(a) factor requires me to consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). In her role as a pill smurfer, Newhouse was involved in purchasing legal cold remedies containing pseudoephedrine for small meth cooks. On the day of her arrest, March 12, 2011, the PSR indicates Newhouse was observed with a co-defendant by Webster County Drug Task Force officers "purchasing pseudoephedrine at Walgreens and Wal-Mart in Fort Dodge." Newhouse then proceeded to co-defendant Tracy Young's house "to provide Tracy Young with the pseudoephedrine they had just purchased, as well as lithium batteries and tree fertilizer spikes in exchange for methamphetamine." The PSR further provides: "Nearly two hours later, the defendant and Silvey left Young's house and proceeded to the defendant's residence where officers stopped and detained both the defendant and Silvey. Officers confiscated a glass pipe, lithium batteries, and a small amount of methamphetamine during their search of the defendant."

The PSR also indicates that: "As a part of their investigation, agents reviewed pseudoephedrine purchase logs from several pharmacies in the Fort Dodge, Iowa, area. These logs reflected that the defendant purchased 70.56 grams of pseudoephedrine between May 2006 and March 2011."

The PSR concludes with Newhouse's Offense Conduct section: "Within her plea agreement, the defendant stipulated to the following facts: She was involved with at least 20 grams of methamphetamine actual and/or at least 40 grams of pseudoephedrine; all of her pseudoephedrine purchases from about May 2009 through May 2011 went to others for the manufacture of methamphetamine; and she received methamphetamine in exchange for the pseudoephedrine."

In sum, the Offense Conduct section of her PSR clearly indicates that Newhouse was a pill smurfer obtaining nonprescription cold remedies and swapping them for home-made manufactured methamphetamine. There is not a shred of evidence indicating that Newhouse's participation in this crime involved a scintilla of violence or that her participation was for any other reason than to feed her long established methamphetamine addiction. While pill smurfers like Newhouse are at the bottom of the methamphetamine drug hierarchy, the guidelines do not treat them accordingly. In every sense, Newhouse was low-hanging fruit in the government's "War on Drugs."

### 3.    *Newhouse's history and characteristics*

The first § 3553(a) factor also requires that I consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The history and characteristics gleaned from Newhouse's PSR ring all too familiar to me and replicate a pattern commonly seen among non-violent methamphetamine addicts in our district.[27] Newhouse is 33 years old. Her parents divorced when she was two. She was raised by

---

[27] According to Fiscal Year 2011 data from the U.S. Sentencing Commission, methamphetamine is 18.1% of the drug type and drugs are 29.1% of the average federal district court's criminal docket. U.S. Sentencing Comm'n, Statistical Information Packet: Fiscal Year 2011 Judge Mark W. Bennett 1 fig. A (2012). Being in the methamphetamine heartland, my numbers are staggering. Methamphetamine cases are 78.3% of my drug docket and drug cases represent 46.6% of my criminal docket. *Id.*

her father and a physically and emotionally abusive step-mother until she was 14. According to Newhouse, both parents suffered from long-term substance abuse and her mother from major mental illnesses, including Bipolar Disorder. Newhouse believes her father "also has a history of mental health issues."

By age 14, Newhouse was running away from home and placed in a series of group homes. Her only and older sister by three years has a record of prior drug convictions and incarcerations due to her own substance abuse. Her current boyfriend also has a history of substance abuse. She has three sons, ages 14, 8, and 5. The oldest has lived with his father since a young age and her other two now reside with their father due to her arrest on this charge. Newhouse has a close relationship with her three sons.

Newhouse has had previous mental health issues but is not currently taking any medication. Newhouse started smoking marijuana at age 14 and, for several years prior to her arrest, used it daily. She started using methamphetamine at age 15. At age 21, she became a daily user. From 2005-2007 she was able to abstain from methamphetamine use. But, when her then boyfriend and father of two of her children was released from prison in 2007, she again became a daily user of methamphetamine and continued up to her arrest in 2011. She has experimented with powder and crack cocaine, acid, ecstasy, and heroin. Newhouse has been through drug treatment twice— once in 1996 and again in 2005.

Newhouse offered this candid self-reflection on her methamphetamine addiction:

> While active in my addiction I was constantly in conflict within myself, at war with myself. I had this powerful, desperate desire to get sober but I could never find the strength to do so. I put on an outside that looked put together and in control, while inside I was dying with guilt and shame. I was empty, lonely, discouraged, overwhelmed, and scared. I used meth to try to escape

those feelings. Now I understand that using in fact fed those very feelings and made them even stronger. I strongly believe that meth is a tool that the devil uses because it can so easily trick people into thinking its making us feel good, while it's actually destroying the very core of who we are. In all creation the only thing I'll ever say I hate is methamphetamine. It has taken everything I love away from me and has left me alone, scared, and holding all the broken pieces of my life in my hands.

Newhouse Letter at 2-3, Defendant's Ex. 1. Her statement demonstrates both an awareness of the consequences of her addiction and a willingness to free herself from drugs.

Newhouse dropped out of high school in her senior year in 1997 and reported that "her drug use was a contributing factor to her decision to quit school." Her employment history has been sporadic and never more than for more than $12.00 per hour often much less. The PSR estimates her cost of incarceration with the Bureau of Prisons to be $28,893.40 per year—more than in a residential re-entry center (half-way house).

### 4.    *The need for the sentence imposed*

The second § 3553(a) factor is "the need for the sentence imposed," § 3553(a)(2), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training" or other care or treatment, § 3553(a)(2)(D).

This case reflects the flaw in the Career Offender guideline to overstate the seriousness of a defendant's record and the risk of her reoffending, as recognized by the Sentencing Commission. Newhouse's Career Offender predicate offenses were

drug offenses, not crimes of violence. Both predicate offenses involved small amounts of drugs. I find it particularly significant that each of her convictions arose from the possession of two different drugs at the same time and place. For reasons not disclosed in the record, instead of being charged in a single case with two counts of possessing a controlled substance with the intent to deliver, one count for methamphetamine and another for psilocybin mushrooms, Newhouse had the misfortune to be charged and convicted in two separate cases.[28] But for this charging anomaly, Newhouse would not have two predicate drug convictions and would not qualify as a Career Offender.[29] To

---

[28] My educated guess is it took longer to get lab test results for the mushrooms— so that the trial information for the psilocybin charge was filed after the trial information for the methamphetamine charge.

[29] Newhouse's unfortunate circumstance arises from application of U.S.S.G. § 4A1.2(a)(2)'s definition of the term "prior sentence." Section 4A1.2(a)(2) provides:

> If the defendant has multiple prior sentences, determine whether those sentences are counted separately or as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence.

U.S.S.G. § 4A1.2(a)(2). Thus, under § 4A1.2(a)(2), Newhouse's two predicate controlled substance convictions would have been counted as a single prior offense if the two convictions had been contained in the same charging instrument or if she had been sentenced on both charges on the same day. *See United States v. Jones*, 701 F.3d 327, 329 (8th Cir. 2012) (prosecution conceded that defendant did not qualify as a Career Offender "because some of his previous convictions should have been counted as a single offense since there was no intervening arrest and he was sentenced on the

their credit, the prosecution astutely acknowledges this fact and believes, that it alone, warrants my granting Newhouse a substantial downward variance. I agree.

Without a Career Offender designation, Newhouse would only be criminal history category IV. It is also significant that her record contains no criminal activity suggestive of violence. Yet, application of the Career Offender guideline enhances her advisory guideline range from 70 to 87 months to a shockingly high range of 262 to 327 months.[30] As Judge McConnell cogently pointed out in his concurrence in *Pruitt*:

> By comparison, a defendant who commits second degree murder, but has no criminal history, would have a sentencing range of 235 to 293 months. *See* U.S.S.G. § 2A1.2(a). Moreover, it does not matter, for sentencing purposes, whether [the defendant's] prior drug felonies were large-scale or petty, violent or nonviolent. Her sentencing range would be the same. One might reasonably ask whether a guideline that treats a defendant who has committed a series of relatively minor and nonviolent drug crimes more severely than a murderer, and that takes no account of the seriousness of the predicate crimes, always accounts for "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §§ 3553(a)(1).

---

same day."). Newhouse would not qualify as a Career Offender with a single controlled substance conviction. *See* U.S.S.G. § 4B1.1(a) (defining a Career Offender as having, *inter alia*, "at least two prior felony convictions of either a crime of violence or a controlled substance offense.").

[30]As the *amicus* points out in its brief: "Because the government filed notice that she has a prior drug felony conviction under 21 U.S.C. § 851, her statutory sentencing range increased from 5-40 years, to 10-life. 21 U.S.C. § 841(b)(1)(B) and 851. Therefore, her advisory Guideline range without the Career Offender enhancement would be 120 months." *Amicus* Br. at 3 n.1

*Pruitt*, 502 F.3d at 1167 (McConnell, J. concurring).[31]

An additional example of the irrationality of sentencing Newhouse to even the low end of her Career Offender guideline range, 262 months, is to compare that sentence to one of the most recent court of appeals's decision involving, not the Career Offender guideline, but, the even more feared sister recidivist enhancement, the "Armed Career Criminal" guideline—§ 4B1.4,[32] which carries a mandatory minimum 15 year sentence. Congress enacted the Armed Career Criminal Act (ACCA) in 1984 as "a new federal crime" created specifically to keep "the most dangerous, frequent and hardened offenders" off the street.[33] In *Dawson v. United States,* 702 F.3d 347 (6th Cir. 2012), the trial court initially imposed a 262 month sentence for an armed criminal, Dereck Dawson. *Id.* at 349. "In 2003, Dawson was involved in an altercation with his girlfriend Paula Smith and her son Victor Harris. Trial testimony revealed that, during the altercation, Dawson hit Smith and pointed a gun at Harris, threatening to kill them both. Police responded to the scene and saw Dawson

---

[31] Similarly, a defendant convicted of criminal sexual abuse or air piracy, with no criminal history, would have a sentencing range of 235 to 293 months, *see* U.S.S.G. §§ 2A3.1 and 2A5.1. A defendant convicted of kidnapping, or conspiracy or solicitation to commit murder, with no criminal history, would have a sentencing range half that faced by Newhouse as a result of the Career Offender guideline. *See* U.S.S.G. §§ 2A1.5 (135 to 168 months for conspiracy or solicitation to murder); 2A4.1 (121-151 months for kidnapping).

[32] An Armed Career Criminal is any person convicted under 18 U.S.C. 922(g) and who has at least three prior convictions for a "violent felony" or "serious drug offense" as defined in 18 U.S.C. § 924(e)(2), committed on occasions different from one another.

[33] S. Rep. No 97-585 at 5 (1982) The 15 year mandatory minimum was calculated to "incapacitate the armed career criminal for the rest of the normal time span of his career." *Id.* at 7.

discarding a firearm that turned out to be stolen." *Id.* at 348-49. He "was indicted on two federal firearms charges in connection with the incident. The first was possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g), and the second was possession of a stolen firearm, in violation of 18 U.S.C. § 922(j)." *Id.* at 349. Dawson's prior record included two 1988 convictions for violent felonies – a conviction for attempted burglary in the first degree and assault with intent to commit voluntary manslaughter[34]; a 1993 conviction for attempted rape; and a 2001 aggravated burglary conviction. *Id.* Dawson was convicted on both firearm charges and sentenced to 262 months. These were his fifth and sixth serious felony convictions – most involved violence. On his first appeal, the convictions were affirmed, but the 262 month sentence was set aside because of the intervening decision in *United States v. Booker, 543 U.S. 220 (2005). Id.* The district court resentenced Dawson to the mandatory minimum 180 month sentence, which was then affirmed. *Id.* at 349, 353. What possible rationale would support Dawson, a gun toting violent recidivist offender with six prior felony convictions, receiving a more lenient sentence than Newhouse?

Application of the Career Offender guideline substantially overstates the seriousness of Newhouse's criminal history. This is especially true since her criminal history is made up entirely of relatively minor, non-violent, drug crimes fueled by her long term and serious drug addiction.

The imposition of a lengthy, Career Offender guideline sentence on Newhouse will have a negligible impact deterring the drug trade. Newhouse is hardly the kind of individual that Congress had in mind when it directed the Sentencing Commission to promulgate the Career Offender guideline. Congress's directive was clearly aimed at "drug trafficking offense[s]" involving large amounts of drugs. *See* S. REP. NO. 98-225

---

[34] Corrected Brief for Plaintiff-Appellee United States at *6, *Dawson v. United States*, No. 11-5021, 2011 WL 6961760 (6th Cir. Dec. 13, 2011).

(1983). Newhouse is not Iowa's Pablo Escobar. She is not the kingpin of the Zeta cartel. She is not remotely the repeat drug trafficker envisioned by Congress engaged in an "extremely lucrative" enterprise. Far from it, she was, as I previously mentioned, a low-level pill smurfer. As a low-level cog in methamphetamine production, her role has undoubtedly already been filled by another pill smurfer. *See* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING, AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 134 (2004) (observing that "[i]ncapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else."). Applying the Career Offender guideline to Newhouse, a low-level, non-violent drug addict, results in a sentence significantly greater than necessary to achieve the sentencing goal of protecting the public from further crimes.

A 120 month mandatory minimum sentence is either equal to or greater than the sentences given to all of Newhouse's co-defendants, even those far more culpable. Sentencing Newhouse, a pill smurfer, to the significantly longer term of imprisonment, as called for by application of the Career Offender guideline, would result in her serving a sentence grossly disproportionate to her role and culpability, and would not promote respect for the law.

I further find that a 120 month mandatory minimum sentence of imprisonment is sufficient in length to reflect the seriousness of the offense, promote respect for the law, provide just punishment, protect the public, and reflect the factors embodied in § 3553(a)(2). I also find that a sentence within the Career Offender guideline range of 262 to 327 months is greater than necessary to achieve the purposes set forth in § 3553(a)(2).

I note that there is a ten year gap between the crimes which qualify Newhouse as a Career Offender and the criminal conduct here. She was only 22 years old when she

was convicted of the predicate offenses. These circumstances "undercut[ ] the need to rely on those convictions to enhance [the] sentence." *Naylor*, 359 F. Supp. 2d at 524 (declining to apply the Career Offender guideline where defendant was seventeen when he committed crimes of breaking and entering). Moreover, if Newhouse is sentenced to the mandatory minimum, she will be at least 41 years old when she is released. The Sentencing Commission has found that recidivism rates decline relatively consistently as age increases. *See* U.S. SENTENCING COMMISSION, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 12, ex. 9 (2004). I find that a 120 month mandatory minimum sentence is sufficiently lengthy to protect the public from Newhouse's future crimes.

I also note the great disparity between the 120 month mandatory minimum sentence and the sentences Newhouse previously received. *See United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed."); *see also Patzer*, 548 F. Supp. 2d at 616-17 (considering the disparity between defendant's guideline sentence in current case and defendant's prior sentences in determining length of sentence required for deterrence and observing that "[c]ourts have noted that a large disparity between the punishment prescribed by the career criminal designation and the time served for prior offenses might indicate that the career criminal sentence is in excess of that needed to accomplish the desired deterrent effect."); *United States v. Colon*, 2007 WL 4246470, *7 (D. Vt. 2007) (Judge William K. Sessions III, former chair of the U.S. Sentencing Commission, granting downward departure, in part, because "[t]he career offender designation in Colon's case would result in an unjustifiable and unnecessary lopsidedness between prior sentences and the present sentence"). The longest period of imprisonment Newhouse has previously served is

seven months on a two-year state sentence for possessing marijuana.[35]  A 120 month mandatory minimum sentence is 17 times longer than Newhouse's longest previous sentence.  This incredibly large disparity between a 120 month mandatory minimum sentence and her prior sentences is more than sufficient to accomplish deterrence.  A sentence within the Career Offender guideline range, which more than doubles the 120 month mandatory minimum sentence, is grossly in excess of that needed to accomplish deterrence and is totally unwarranted.

Finally, during a lengthy sentence, Newhouse will have the opportunity to undergo extensive drug treatment in the Residential Drug Abuse Program (RDAP) and to take advantage of vocational training opportunities offered by the Bureau of Prisons. The RDAP program is an intensive drug treatment program where inmates live in separate housing and participate in half-day treatment and half-day school, work, or vocational programs.  Most inmates accepted into the RDAP spend nine months in the program.  *See* BUREAU OF PRISONS, *Substance Abuse Treatment*, http://bop.gov/inmate_programs/substance.jsp.  "Research findings demonstrated that RDAP participants are significantly less likely to recidivate and less likely to relapse to drug use than non-participants. The studies also suggest that the Bureau's RDAPs make a significant difference in the lives of inmates following their release from custody and return to the community." *Id.* I have recommended to the BOP that Newhouse serve her time at the Federal Correctional Institution at Waseca, Minnesota, as it is the closest female BOP facility to Iowa and has one of the best RDAP programs in the country.  Several years ago, I visited Waseca and spoke with 27 female inmates that I had sentenced that were housed there and who were in the RDAP program.  I talked

---

[35]Newhouse's only other two convictions are also drug related, possessing drug paraphernalia, a smoking pipe, when she was 21, and possessing a controlled substance when she was 22.

extensively with the RDAP staff and sat in on RDAP programming with the women. I was extremely impressed by the program and staff. *See* Mark W. Bennett, *Hard Time: Reflections on Visiting Federal Inmates*, JUDICATURE, May-June 2011, at 304. It bears repeating that Newhouse did not commit her crime out of greed or in order to support a lavish life style, but to feed her chronic drug addiction. Newhouse's successful completion of drug treatment combined with new vocational skills would increase her employment possibilities upon release and substantially decrease the likelihood of her recidivism.

### 5.    *The kinds of sentences available*

The third § 3553(a) factor is "the kinds of sentences available," see 18 U.S.C. § 3553(a)(3), and the fourth is "the kinds of sentence and the sentencing range established" for similar offenses. 18 U.S.C. § 3553(a)(4). I have reviewed the sentencing options discussed in the PSR, including custody, supervised release, probation, fines, restitution, and denial of federal benefits. PSR at 14-15. In this case, the kinds of sentences available are largely circumscribed by the 120 month mandatory minimum sentence required by Newhouse's prior felony drug offense conviction. *See* 21 U.S.C. §§ 841(b)(1)(B) & 851.

### 6.    *Any pertinent policy statement*

The fifth § 3553(a) factor is "any pertinent policy statement." 18 U.S.C. § 3553(a)(5). The parties have not directed me to any pertinent policy statement, or asked me to apply one. Thus, while I need not consider any policy statement, *see Gall*, 552 U.S. at 552 U.S. at 54; *Rita*, 551 U.S. at 344, I again note that the downward "departure" encouraged by § 4A1.3(b), p.s., if the defendant's criminal history category "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes" is limited by § 4A1.3(b)(3)(A) to one criminal history category. I reject this policy statement because

this limitation is inconsistent with the Sentencing Commission's own research, *see* Part II.D.2.b.ii. Its application, when applied to low-level, non-violent drug addicts, does not sufficiently temper the Career Offender guideline's potential to overstate the seriousness of a defendant's criminal history and the risk of his or her re-offending. Its application in such cases also does not sufficiently ameliorate the Career Offender guideline's tendency to result in sentences significantly greater than necessary to protect the public by deterring further crimes. Finally, this policy statement's application in such cases does not alleviate unduly harsh sentences that do not promote respect for the law.

### 7. *The need to avoid unwarranted sentencing disparities*

The sixth § 3553(a) factor is "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In *Beiermann*, I noted that a concomitant of this principle is the need to avoid unwarranted similarities among defendants who are not similarly situated. *See Beiermann*, 599 F. Supp. 2d at 1115-16 (citing *Gall*, 552 U.S. at 55, which recognizes the "need to avoid unwarranted similarities among other co-conspirators who were not similarly situated").

Here, the Sentencing Commission's prophecy about the Career Offender guideline's potential for unwarranted sentencing uniformity comes to fruition. *See* U.S. Sentencing Comm'n, Memorandum from Gary J. Peters to all United States Sentencing Commissioners 13 (March 25, 1988), *available at* http://www.src-project.org/wp-content/uploads/2009/08/ussc_report_careeroffender_19880325.pdf. Newhouse is being treated precisely the same as any drug kingpin convicted of manufacturing 5 grams or more of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), who has the two predicate drug felonies to qualify as a Career Offender. The Career Offender guideline does so without taking into account significant

differences in the severity of predicate drug offenses.  As a result, Newhouse, who has two convictions for possessing small quantities of drugs with intent to distribute, for which she was sentenced to probation, is treated identically to a defendant who heads a drug network and has multiple convictions for trafficking large quantities of drugs and possessing firearms to further distribution of narcotics.

Newhouse's case is also a prime example of the Career Offender guideline creating unwarranted sentencing disparities among defendants who have been found guilty of the same criminal conduct.  The following chart compares, without applying the Career Offender guideline to Newhouse, the criminal histories, offense levels, sentencing ranges, and sentences received by the co-defendants in this case.

| Defendant | Criminal History | Offense Level | Sentencing Range | Sentence Received |
|-----------|------------------|---------------|------------------|-------------------|
| Rex Silvey | II | 27 | 78-97 | 36 |
| Martin Brobst | II | 29 | 97-121 | 60 |
| Patrick McGuire | I | 25 | 57-71 | Time served |
| Sandra Young | III | 29 | 120-135 | 60 |
| Tracy Young | I | 33 | 135-168 | 120 |
| Newhouse | IV | 23 | 70-87 | XX |

Although Newhouse has the highest criminal history category, her offense level is the lowest.  Next to co-defendant McGuire, Newhouse has the lowest sentencing range.  A 120 month mandatory minimum sentence was imposed on Tracy Young who, while only a criminal history category I, has an offense level much higher than Newhouse.

As the following chart demonstrates, application of the Career Offender guideline to Newhouse dramatically alters this landscape.

| Defendant | Criminal History | Offense Level | Sentencing Range | Sentence Received |
|---|---|---|---|---|
| Rex Silvey | II | 27 | 78-97 | 36 |
| Martin Brobst | II | 29 | 97-121 | 60 |
| Patrick McGuire | I | 25 | 57-71 | Time served |
| Sandra Young | III | 29 | 120-135 | 60 |
| Tracy Young | I | 33 | 135-168 | 120 |
| Newhouse | VI | 34 | 262-327 | XX |

Application of the Career Offender guideline gives Newhouse the highest criminal history, offense level, and sentencing range. Newhouse was not the leader of this group, but a mere pill smurfer. Nonetheless, if Newhouse was sentenced at the bottom of the advisory guideline range, 262 months, her sentence would nearly equal the combined sentences given to all five of her co-defendants, 276 months. Indeed, operation of the Career Offender guideline here opens the completely absurd possibility that Newhouse's sentence could be greater than all five of her co-defendants **combined**! Thus, notwithstanding the differences in criminal histories between Newhouse and her co-defendants, applying the Career Offender guideline to Newhouse creates unwarranted sentencing disparities among defendants who have engaged in the same criminal conduct. *See United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) ("[D]istrict courts have discretion, in appropriate cases, to align co-defendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system.").

The 120 month mandatory minimum sentence equals or is greater than the sentences given Newhouse's co-defendants, even those far more culpable than her.[36] A 120 month mandatory minimum sentence comes closest to satisfying § 3553(a)(6)'s mandate to avoid unwarranted sentencing disparities. Sentencing Newhouse to the longer sentence called for by the Career Offender guideline would run counter to § 3553(a)(6) and create a gross sentencing disparity.

### 8. *The need to provide restitution*

The final § 3553(a) factor is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). This factor does not apply.

### 9. *Consideration of downward variance and sentence*

After considering the § 3553(a) factors, I grant Newhouse's variance motion on two alternative grounds: first, my quasi-categorical policy disagreement with the Career Offender guideline as applied to a low-level, non-violent drug addict; and

---

[36] As Senior United States District Judge for the Northern District of Florida, Roger Vinson recently commented:

> [T]he problem in these [minimum mandatory sentencing] cases is that the people who can offer the most help to the government are the most culpable, so they get reduced sentences while the small fry, the little workers who don't have that information, get the mandatory sentences. The punishment is supposed to fit the crime, but when a legislative body says this is going to be the sentence no matter what other factors there are, that's draconian in every sense of the word. Mandatory sentences breed injustice.

John Tierney, *For Lesser Crimes, Rethinking Life Behind Bars*, N.Y. TIMES, Dec. 12, 2012, at A1. In this case, two of Newhouse's co-defendants were able to reduce their sentences through cooperation agreements with the prosecution and two co-defendants had their advisory guideline range reduced because they were safety valve eligible pursuant to 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.

second, based on my individualized assessment of the § 3553(a) factors.  Each of these grounds is discussed below.

### i.    *Quasi-categorical policy disagreement*

For the reasons stated above, I reject, on quasi-categorical policy grounds U.S.S.G. §§ 4B1.1 and 4B1.2, at least where the defendant, like Newhouse, is a low-level, non-violent drug addict.  I find that imposition of a Career Offender guideline sentence would yield an excessive and unjust sentence.  Specifically, in this kind of case, the Career Offender guideline has the potential to overstate the seriousness of a defendant's record and her risk of re-offending, to result in a sentence significantly greater than necessary to protect the public by deterring further crimes of the defendant, to result in unwarranted sentencing uniformity and unwarranted sentencing disparities among defendants found guilty of similar conduct, to result in an unduly harsh sentence which does not promote respect for the law, and to be inconsistent with the obligation to apply all of the relevant § 3553(a) factors.[37]  Even if I were not inclined

---

[37] I have limited my criticisms of the Career Offender guideline to those applicable in this case.  However, these are not its only failings.  The Career Offender guideline has had a disturbing, grossly disparate impact on African-Americans.  *See* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING, AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 134 (2004) (noting that African-Americans are more likely to have prior drug convictions than similar white drug dealers because of the ease of detecting drug offenses that take place in "open-air drug markets, which are most often found in impoverished minority neighborhoods.").  In 2000, while African-Americans made up 26% of the offenders sentenced under the guidelines, they accounted for 58% of the offenders subjected to the incredibly harsh sentences dealt out under the Career Offender guideline.  *Id.* at 133.  Another failing of the Career Offender guideline lies in its overly broad definition of a "crime of violence" that sweeps up a wide variety of offenses that do not involve the intentional use of force, resulting in an expansion of the class of offenders far beyond what Congress intended by 28 U.S.C. § 994(h). *See generally* Baron- Evans *et. al*, *Deconstructing the Career Offender Guideline*, 2 CHARLOTTE L. REV. at 58-74.

to generally reject the Career Offender guideline on quasi-categorical policy grounds, where a defendant is a low-level, non-violent drug addict, I find that application of the Career Offender guideline yields an excessive sentence in this case after considering the § 3553(a) factors.

## ii.        Variance and sentence

After considering the § 3553(a) factors, I find that a sentence lower than the Career Offender guideline range is warranted.  Specifically, I find that a sentence of 120 months imprisonment, followed by a lengthy period of supervised release is "sufficient but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).  First, I have considered Newhouse's history and characteristics in arriving at this sentence.  She has no history of violence.  Newhouse is a long-term, chronic drug addict whose entire criminal history is tied to her addiction.  The height of her involvement in the drug trade has been as a low-level pill smurfer.  I find that Newhouse's history and characteristics warrant no more punishment than the 120 month mandatory minimum sentence.

The 120 month mandatory minimum sentence is also sufficient to reflect the seriousness of the offense.  Without the application of the Career Offender guideline and the statutory mandatory minimum, Newhouse's guideline range would be 70 to 87 months, given her criminal history and offense conduct.  The 120 month mandatory minimum sentence fully takes into account the fact that the present offense is not Newhouse's first drug offense conviction.  In contrast, the Career Offender guideline range for Newhouse of 262 months (almost 22 years) to 327 months (roughly 27 and one-quarter years) is longer than necessary to achieve the goals of sentencing.

A 120 month mandatory minimum sentence does not create unwarranted sentencing disparities.  This sentence is as proportional as possible to other sentences imposed on Newhouse's co-defendants, particularly Tracy Young, who has a much

higher offense level, but is only a criminal history category I. This sentence, while below that called for by the Career Offender guideline, is still many times longer than any of Newhouse's previous terms of incarceration, and thus more than sufficient to deter her.

A sentence of 120 months is a substantial amount of time to spend in prison and is sufficiently severe to promote respect for the law. This sentence is also sufficiently lengthy to deter others—assuming lengthy sentences actually deter drug use or drug selling—which is contrary to my experience. In contrast to the Career Offender guideline range, a sentence of this length will enhance the public's confidence in the criminal justice system and not breed disrespect for it. This is especially true, here, since Newhouse's criminal history is made up entirely of relatively minor, non-violent, drug crimes fueled by her long term and serious drug addiction. Indeed, I believe a sentence less severe than the mandatory minimum 120 months would be sufficient here to promote respect for the law and achieve the other purposes of sentencing under §3553(a).

### F.    The Prosecution's Substantial Assistance Motions

The prosecution has filed substantial assistance motions under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. A § 3553(e) motion allows me to sentence below the mandatory minimum.[38] *See United States v. Freemont*, 513 F.3d 884, 888 (8th Cir.

---

[38] Section 3553(e), provides that:

> Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendants substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines

2008); *United States v. Williams*, 474 F.3d 1130, 1131 (8th Cir. 2007). The prosecution has recommended a 20% reduction in Newhouse's sentence based on her assistance. Based on my independent review of the § 5K1.1(a) factors, I agree with the prosecution that a 20% reduction in Newhouse's sentence is warranted and reduce her sentence to 96 months.

## III.    CONCLUSION

Based on my quasi-categorical policy disagreements with the Career Offender guideline, I reject it in this case where the defendant is a low-level, non-violent drug addict engaged in the drug trade to obtain drugs to feed her addiction. Miscarriage of justice usually brings to mind infamous cases of innocent individuals languishing in prison for decades before exoneration, often by DNA. But as Judge John Gleeson cogently observed, "the truth is that most of the time miscarriages of justice occur in small doses, in cases involving guilty defendants. This makes them easier to overlook. But when they are multiplied by the thousands of cases in which they occur, they have a greater impact on our criminal justice system than the cases you read about in the newspapers or hear about on 60 Minutes." *United States v. Vasquez*, No. 09-CR-259 (JG), 2010 WL 1257359, at *1 (E.D.N.Y. Mar. 30, 2010).[39] Imposition of the Career Offender guideline to Newhouse would be a miscarriage of justice.

---

and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

Title 18 U.S.C. § 3553(e).

[39] Judge John Gleeson is a highly regarded federal district court judge, and former chief of the Organized Crime and Racketeering section of the United States

Even if I did not reject the Career Offender guideline on quasi-categorical policy grounds in this case, I find that application of the Career Offender guideline yields an excessive sentence, when individualized consideration is given to the 18 U.S.C. § 3553(a) factors. After considering these factors, I vary downward from the advisory Career Offender guideline sentencing range of 262 to 327 months to the mandatory minimum of 120 months. I further grant the prosecution's motions for substantial assistance, reduce Newhouse's sentence by 20%, and impose a sentence of 96 months imprisonment followed by 96 months of supervised release. A 96 month sentence is still exceptionally long, "[e]xcept, perhaps, to judges numbed by frequent encounters with the results of the Sentencing Guidelines. . . ." *Pruitt*, 502 F.3d at 1167 (McConnell, J. concurring).

      **IT IS SO ORDERED**.

      **DATED** this 30th day of January, 2013.

_Mark W. Bennett_

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

Attorney's Office in the Eastern District of New York. In Senator Daniel Patrick Moynihan's statement during Judge Gleeson's August 25, 1994, confirmation hearing he noted: "Mr. Gleeson is, in fact, the chief of the organized crime and racketeering section of the U.S. attorney's office in Brooklyn, and if I could just read from a New York Times story about his nomination, it simply says, 'A prosecutor who played a central role in sending John Gotti, the notorious Mafia boss, to prison for life was recommended yesterday for a Federal judgeship.'" *Confirmation Hearings on Federal Appointments: Hearing Before the S. Comm. on the Judiciary*, 103rd Cong. 1031 (1994) (Statement of Senator Daniel Patrick Moynihan). Judge Gleeson's extremely important and insightful observations about miscarriages of justice—even for the guilty—are even more weighty given his stellar prior record prosecuting notorious organized crime defendants.